Amanda J. Krause (NY Reg. #5323357)
(Admitted *pro hac vice*)
Tel.: (202) 445-8767 / Email: Amanda.Krause@cfpb.gov
Joyce Chen (NY Reg. #4717245)
(Admitted *pro hac vice*)
Tel.: (202) 702-4226 / Email: Joyce.Chen@cfpb.gov
Jeffrey Blumberg (MD Bar)
(Admitted *pro hac vice*)
Tel.: (202) 435-9687 / Email: Jeffrey.Blumberg@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-7722

Leanne E. Hartmann, CA Bar # 264787- Local Counsel
301 Howard St., Suite 1200
San Francisco, CA 94105
Phone: (415) 844-9787
Fax: (415) 844-9788
Email: Leanne.Hartmann@cfpb.gov

Attorneys for Plaintiff
Consumer Financial Protection Bureau

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau, | Case No. 2:21-cv-07492-VAP-JDE |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, DISGORGEMENT, DAMAGES, AND CIVIL MONEY PENALTIES** |
| Daniel A. Rosen, Inc., d/b/a Credit Repair Cloud, and Daniel Rosen, | |
| Defendants. | |

**Introduction**

1.     The Consumer Financial Protection Bureau ("Bureau") brings this action against Daniel A. Rosen, Inc. d/b/a Credit Repair Cloud ("Credit Repair Cloud" or "CRC") and Daniel Rosen under the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6102(c), 6105(d); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310; and the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5536(a), 5564, 5565. This Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2.     Defendants Credit Repair Cloud and Daniel Rosen have provided substantial assistance or support to credit-repair businesses charging unlawful advance fees to consumers in violation of the TSR.

3.     The Bureau brings this action to stop Defendants' unlawful conduct, obtain relief for harmed consumers from Defendants, disgorge Defendants' unjust gains, and impose civil money penalties on Defendants for their unlawful actions.

**Venue**

4.     Venue is proper in this district because each Defendant is located, resides, or does business in this District. 12 U.S.C. § 5564(f).

**Parties**

5.     The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). It has independent litigating authority and may secure appropriate relief for violations of the CFPA, 12 U.S.C. § 5564(a)-(b), and for violations of the TSR with respect to consumer financial products or services subject to the CFPA, 15 U.S.C. §§ 6102(c), 6105(d).

6.     Credit Repair Cloud is a privately owned California corporation that operates out of 12517 Venice Blvd., Los Angeles, CA 90066. Since 2013, Credit Repair

Cloud has advertised, marketed, promoted, offered for sale, and sold credit-repair-business software and other tools to credit-repair businesses ("CRC Users" or "Users") throughout the United States.

7. Daniel Rosen is the founder, owner, and CEO of Credit Repair Cloud. Rosen resides in Los Angeles, California.

## The TSR and Credit-Repair Services

8. A credit-repair business offers or provides to consumers services represented to remove derogatory information from, or improve, a consumer's credit history, credit record, or credit rating.

9. Credit-repair businesses challenge or dispute negative items that appear on consumer reports on consumers' behalf. Such items are supposed to be removed if found to be inaccurate or incomplete, or if they cannot be verified.

10. The TSR prohibits credit-repair businesses that telemarket their services from requesting or receiving any fee until they have provided the consumer with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. 16 C.F.R. § 310.4(a)(2).

## Credit Repair Cloud's Business Practices

11. Credit Repair Cloud offers an "all-in-one solution" for people to start and run their own credit-repair businesses. Credit Repair Cloud has advertised that it gives its Users "EVERYTHING you need to start a … credit repair business!"

12. Credit Repair Cloud markets and sells its products and services to individuals and businesses nationwide.

13. Credit Repair Cloud advertises that to start a credit-repair business using Credit Repair Cloud, "all you need is a computer, a phone and software."

14. Credit Repair Cloud targets as clients individuals who are seeking to start their own business and advertises that "credit repair is the lowest cost & most profitable

1   business you can launch," and that a credit repair business is "a very affordable startup"

2   that costs "close to nothing."

3       15.    Credit Repair Cloud further advertises that it provides substantial support to

4   its Users in conducting their credit-repair businesses. Specifically, Credit Repair Cloud

5   advertises: "We'll hold you by the hand as you launch your very own Credit Repair

6   Business," and in a Credit Repair Cloud training video, Rosen states that Credit Repair

7   Cloud "will be directly involved in your success."

8       16.    Credit Repair Cloud provides CRC Users with software (the "Software")

9   that provides, among other things, a customer-relationship management ("CRM") system.

10  Through the CRM system, Users can track and organize customer details and activity,

11  including customer names, contact information, the date they signed up for credit-repair

12  services, and whether customers are up-to-date on their payments for credit-repair

13  services.

14      17.    The Software allows CRC Users to import and review their customers'

15  credit reports, and the Software will automatically flag negative items on customers'

16  credit reports for Users. Credit Repair Cloud has advertised that Users can "import credit

17  reports and generate credit audits with 1 click!"

18      18.    The Software contains a database of over 100 template-dispute letters that

19  the Software will automatically pre-populate with customer information, allowing CRC

20  Users to generate letters to mail to consumer-reporting agencies disputing information on

21  customers' credit reports. Credit Repair Cloud has advertised that with the Software,

22  Users can "Generate dispute letters in seconds!"

23      19.    The Software allows CRC Users to track whether a particular disputed item

24  on a consumer's credit report has been validated, whether it has been found to be

25  inaccurate or incomplete, or whether it cannot be verified.

26      20.    The Software contains template contracts for CRC Users to supply to their

27  customers.

28

21.     CRC Users can connect the Software with a third-party billing platform that allows CRC Users to easily set up monthly recurring billing for their customers.

22.     Through the Software, CRC Users can track customer activity and key performance indicators, such as average revenue.

23.     In addition to the Software, Credit Repair Cloud provides training programs on how to start and run a credit-repair business, as well as other resources to CRC Users, including telemarketing sales scripts, template marketing materials, and customizable website templates. Credit Repair Cloud advertises that its website templates are "professionally written and ready for your Credit Repair Business" and that Users can customize themselves "by easy point and click. No design experience necessary."

24.     Credit Repair Cloud's training includes guidance on how CRC Users can increase their sales by generating more leads—*i.e.*, prospective customers—to add to a "sales funnel." That guidance includes buying advertisements or enlisting affiliates, such as mortgage loan officers or auto lenders, to refer potential customers to the CRC User's credit repair business.

25.     The Software includes an affiliate portal for Users to employ, which allows affiliates to enter contact information, including telephone numbers, of potential customers who are seeking to improve their credit.

26.     Credit Repair Cloud makes clear on its website that the goal for CRC Users is to remove derogatory information from, or improve, their customers' credit history, credit record, or credit rating. In a section of its website entitled, "Introduction: How Does Credit Repair Work," Credit Repair Cloud lays out steps for disputing "negative items" with the three nationwide consumer reporting agencies using the template letters the company provides. The final step listed on that page is: "Over time negative items are corrected, and the consumer's score goes up! The client is thrilled and keeps paying your monthly fee!" On the same page, in response to the question, "How do successful Credit

Repair companies make a profit," Credit Repair Cloud states that such companies, among other things, "Deliver what they promise."

27.  The template marketing materials that Credit Repair Cloud provides to Users, including printable pamphlets, fliers, and business cards, make clear what those "promises" are. Those marketing materials include statements such as: "Most people can raise their credit scores by 50-100 points or more by following our program"; "Credit issues? We can help! Most credit reports contain errors that can lower your score and keep you from living the life you deserve"; and "We can get your life back, so you can … get approved for a mortgage; get approved for your dream car; get approved for credit cards."

28.  In addition to providing instructions and materials for Users, Credit Repair Cloud facilitates networking among Users through social media as well as through in-person gatherings. Credit Repair Cloud hosts an annual credit-repair conference, and it created a private community chat group on Facebook, through which Users solicit feedback on their websites and their advertisements, inquire about fee structures, or ask questions regarding, among other things, legal compliance issues related to credit repair. The private group provides an opportunity for Users to ask questions to other members of the Facebook group, and Daniel Rosen participates in responding to questions.

**Role of Daniel Rosen in Credit Repair Cloud**

29.  Rosen is the sole owner and director of Credit Repair Cloud and has managerial responsibility for the company.

30.  Rosen controls Credit Repair Cloud's finances, as well as the content of the Software and the Credit Repair Cloud training programs.

31.  Rosen participates directly in the Credit Repair Cloud training programs, including teaching Credit Repair Cloud's "Master Class" on credit repair, and he is the featured speaker on many of the training videos available to CRC Users. He appears in over 100 videos on Credit Repair Cloud's social media pages, in which he teaches on

credit repair, how to get rich with a credit repair business, how to quickly start a credit-repair business, how to use affiliates for marketing, and how to convert leads into sales, among other topics. Rosen writes blog posts that are posted on the Credit Repair Cloud website in which he provides advice to prospective and active CRC Users regarding, among other things, how to convert prospective customers into active paying customers and how and when to collect fees.

32.   Rosen wrote a book about how to start and run a credit-repair business, which included template-dispute letters, and he hosts a podcast on which he has interviewed successful CRC Users. Rosen's book and podcast are advertised on the Credit Repair Cloud website.

33.   Rosen also sends emails directly to prospective and current CRC Users in which he, among other things, markets Credit Repair Cloud's training programs and provides tips on how to remove items from consumers' credit reports.

**CRC Users Have Been Violating the TSR**
**by Telemarketing and Charging Advance Fees to Consumers**

34.   CRC Users offer credit-repair services to consumers. CRC Users have advertised that their credit-repair services can help consumers get approved for a mortgage or auto loan or help reduce loan interest rates.

35.   At least some, and likely many, CRC Users are engaged in telemarketing, and therefore they are required to comply with the TSR.

36.   CRC Users advertise their credit-repair services in various mediums, including social media, and receive calls from and make calls to potential customers during which such Users endeavor to sell their credit-repair services. Some Users partner with third-party affiliates, such as mortgage brokers or auto lenders, who refer potential customers to the User, after which the User receives a call from or makes a call to the potential customer. Credit Repair Cloud's affiliate portal is used by such affiliates to

provide telephone numbers of potential customers for Users to call. Some Users utilize a combination of advertising and affiliate referrals to generate leads.

37.    Many Users' websites request that potential customers provide their telephone number in order to receive a free telephone credit consultation, during which the User describes to the potential customer how the User's credit-repair services might help the potential customer improve or repair their credit. The credit consultation, therefore, is essentially a call to market and sell the User's credit-repair services.

38.    For example, one CRC User (User A) uses the telephone to make sales calls to potential customers who provide their telephone number to User A through User A's website. User A has utilized Credit Repair Cloud's website template. The Credit Repair Cloud website template includes a telephone number for the User  and a link to a web form that encourages potential customers to fill out their contact information, including a telephone number, that the User can employ to reach out to the potential customer to make a sale. User A has contacted potential customers who have completed the form to schedule a telephone call, during which User A would explain the credit repair process and answer the potential customer's questions, and from there, enroll the customer in User A's credit-repair services. User A conducted such telephone calls with customers in more than one state.

39.    User A has charged customers a fee at the time of enrollment, followed by recurring monthly fees.

40.    Another CRC User (User B) has conducted telephone sales calls with customers residing in more than one state, and has used a robo-dialer to conduct calls. User B also has conducted telephone sales calls with potential customers whose phone numbers have been input into Credit Repair Cloud's affiliate portal by User B's affiliates.

41.    User B has charged customers a fee for an initial consultation, followed by recurring monthly fees.

42.     A third CRC User (User C) has advertised on social media and paid social media influencers to advertise its credit-repair services, and has advertised its telephone number on its website next to a statement that reads: "CALL TODAY." When potential customers have called the telephone number advertised on User C's website, either an employee of User C would answer the call, or the potential customer would hear a pre-recorded message that explained User C's credit-repair services before being connected with an employee to enroll the customer in credit-repair services. User C has conducted such calls with customers residing in more than one state.

43.     User C has charged customers at the time of enrollment, followed by recurring monthly fees.

44.     A fourth CRC User (User D) has received referrals of potential customers from affiliates, including mortgage loan officers, after which User D would initiate a telephone call to the potential customer, or the potential customer would call User D. During such calls, User D has explained its credit-repair services, answered the potential customers questions, and then enrolled customers in User D's credit-repair services. User D has conducted such calls with customers in more than one state.

45.     User D has charged customers for an initial consultation, followed by recurring monthly fees.

46.     None of the CRC Users described in paragraphs 38–45 have waited to request or receive payment from customers until after providing such customers with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

47.     At least 80 additional CRC Users have advertised telephone numbers on their websites, sometimes accompanied by statements encouraging potential customers to call the CRC User to learn more about their services. Those same websites show that those Users charge fees at enrollment, on a recurring monthly basis, or both.

48.     Therefore, CRC Users have been violating the TSR.

49.     As discussed below, Credit Repair Cloud and Rosen have encouraged and facilitated both the use of telemarketing and the charging of advance fees by Users.

### Credit Repair Cloud and Rosen Have Encouraged
### CRC Users to Telemarket their Credit-Repair Services

50.     Credit Repair Cloud and Rosen have encouraged the use of telemarketing to sell credit-repair services.

51.     Credit Repair Cloud encourages CRC Users to provide their telephone number on their websites because "[s]ome people want to speak to a real person."

52.     In a Credit Repair Cloud training video, Rosen states that the most important information on a CRC User's website should be at the top of the page, which should include a "visible call to action." According to Rosen: "Call to action is a button … that should be visible in the top part above the fold. And [that button] should go to a form that populates right into your software. That's going to get you the most leads that you follow-up with by phone."

53.     In the same training video, Rosen further advises: "Make sure you have your phone number on the site. Yes, you do want to have your phone number. You do want leads to call you, this is sales and people need to reach you." Rosen further states: "Remember the goal of the [web]site is lead generation. By having a … [web]site that pushes people to request information from you … they become leads in your sales funnel."

54.     The template websites Credit Repair Cloud provides to Users include toll-free telephone numbers and stock language instructing potential customers to call Users, and the template marketing materials Credit Repair Cloud provides Users include toll-free telephone numbers along with language encouraging a potential customer to "call now for a free consultation and credit analysis."

55.     Credit Repair Cloud has included links on its website to some of its successful Users' websites, which in turn advertise toll-free telephone numbers.

56.     In addition to encouraging Users to advertise a telephone number to conduct sales, Credit Repair Cloud and Rosen—through the Credit Repair Cloud training program, blog posts available on the Credit Repair Cloud website, Rosen's book, and Rosen's podcast—advise Users on how to conduct a successful telephone sales call.

57.     For instance, in a July 26, 2015 blog post on Credit Repair Cloud's website titled "Creating a Killer Sales Script for Credit Repair Services," Rosen writes: "When creating a script or training your sales representatives to communicate with prospects, especially over the phone, building in opportunities to share their passion and energy is key."

58.     In his book, Rosen provides guidance regarding how to conduct a telephone sales call, including guidance on what Users should say to prospective customers to induce the purchase of credit-repair services:

> Convincing [potential customers] that your credit repair service can help them achieve their goals requires a softer, more engaging technique that begins the process of building trust. … First, it helps a great deal to think about sales as an extension of your marketing pipeline. Before each sales call, your sales reps should know how the prospect entered the pipeline. This will create context for their conversation. … [W]hen you're working with leads and prospects it's very important to keep detailed sales notes in your Credit Repair Cloud.

> Ultimately, the goal is to invite the client to a free consultation where you will explain the credit repair process, how the bureaus work, give them a general timeline, help them order a credit report, and encourage them to start services.

59.     Credit Repair Cloud and Rosen also provide Users with template sales scripts to use during telemarketing calls. They distribute such scripts, including one entitled, "The Perfect Sales Script for Credit Repair Leads" in Credit Repair Cloud

training courses, including the Master Class course taught by Rosen. "The Perfect Sales Script for Credit Repair Leads" includes multiple references to conducting sales calls by telephone.

**Credit Repair Cloud and Rosen Have**

**Encouraged and Facilitate CRC Users' Charging of Advance Fees**

60.     Credit Repair Cloud and Rosen have encouraged CRC Users to charge consumers at enrollment, with monthly fees thereafter.

61.     Credit Repair Cloud advises Users to charge an initial fee after doing "some initial document processing," followed by monthly recurring fees. In the FAQ page on its website, in response to the question, "Can I charge upfront fees for Credit Repair," Credit Repair Cloud states:

> This is how all successful credit repair companies get paid: … they import a report and send off a round of letters (about 10 mins of work) and then they charge a '1st work fee.' Then every month they send off another round of letters or click to update status of items that were removed (about 5 minutes of work) and they charge a monthly fee. This is why the monthly recurring model [of charging] works so well for credit repair.

62.     In Credit Repair Cloud's training program, the company represents: "We have seen thousands of credit repair companies. The companies that do the best follow the other leaders in this business. They charge a 'First Work' fee when the client first signs up. Then they charge a small monthly fee each month."

63.     Credit Repair Cloud's materials guide Users to charge initial fees followed by monthly recurring fees. For example, the template contracts provided by Credit Repair Cloud are prepopulated with blanks for Users to fill in amounts for the "first work" fee and the monthly fee.

64.     The Software integrates a billing platform, run by a third party, that allows Users to charge an enrollment or first-work fee, as well as monthly recurring fees. Rosen

encourages Users to sign up for this third-party billing platform, which he says will "pay[] for itself in the extra revenue it collects for you."

65.  Credit Repair Cloud has advertised that using the third-party billing platform integrated with Credit Repair Cloud's Software allows Users to "[c]ollect recurring client payments from within Credit Repair Cloud" and that customer payments "can be triggered by events in Credit Repair Cloud."

66.  Neither Credit Repair Cloud nor Rosen instruct or encourage Users to wait to charge fees until after they have provided the consumer a consumer report, issued more than six months after the promised results have been achieved.

67.  Credit Repair Cloud further encourages the charging of advance fees by holding out as models certain Users who employ a business model that violates the TSR.

68.  In many of Credit Repair Cloud's social-media postings and on its website, it advertises a Millionaire's Club, showcasing Users who have obtained $1 million in revenue and suggesting, though its advertisements, that new Users can also achieve the same success.

69.  For instance, Credit Repair Cloud advertises that Users can "build [their] dream business" and "learn how to become a credit repair millionaire from industry leaders through a built-in membership community and a simple business management platform."

70.  Credit Repair Cloud has highlighted the business practices, business models, or websites of some of the Users who are members of the Millionaires Club, including Users B, C, and D, and some of such Users also discuss their business model and success at in-person gatherings. At least some of the Users who are showcased as Millionaires telemarket and charge advance fees in violation of the TSR, including Users B, C, and D.

71.  Rosen himself encourages Users to charge consumers enrollment fees and monthly recurring fees, including through training videos and in his blog posts available on the Credit Repair Cloud website, his book, and his podcast.

72.   For instance, in his book, Rosen writes: "People charge in different ways: flat fee, pay per deletion, etc. But of all the methods we see, charging a one-time 'first work' fee followed one month later by affordable, recurring monthly payments is always the ticket to high revenue. Since each client takes less than 5 minutes of processing per month (after setup), a small reasonable monthly fee is appropriate."

**Credit Repair Cloud's and Rosen's**

**Knowledge of CRC Users' Violations of the TSR**

73.   Credit Repair Cloud and Rosen have known or have consciously avoided knowing that its Users were telemarketing and charging advance fees in violation of the TSR.

74.   Through, among other things, social-media interaction, in-person networking gatherings, interviews of Users, access to information regarding Users' fee structure, and review of Users' business models, including but not limited to those of the Millionaire's Club members, Credit Repair Cloud and Rosen have been aware that Users were actually engaging in those practices.

75.   Credit Repair Cloud and Rosen have known or consciously avoided knowing that Users conduct telephone sales calls with consumers in more than one state. They have knowledge or have consciously avoided knowing that CRC Users telemarket their credit-repair services because they have actively encouraged telemarketing to sell credit-repair services.

76.   CRC Users discuss their use of telemarketing with Rosen and Credit Repair Cloud employees.

77.   For example, User B emailed Rosen and another Credit Repair Cloud employee and referenced that the company uses a robo-dialer for its credit-repair business.

78.   User A's owner discussed User A's telemarketing tactics with Rosen during an interview Rosen conducted on his podcast, including the time of day User A has

AMENDED COMPLAINT

14

1  conducted sales calls with potential customers and what is discussed with those

2  customers during calls to induce them to purchase User A's credit-repair services.

3      79.    Rosen and Credit Repair Cloud employees who provide User support have

4  administrative access that allows them to see the Software from a specific User's

5  perspective, including any call notes and information showing that Users' customers

6  reside in more than one state.

7      80.    Users A, B, C, and D all have information contained in the Software,

8  including information showing that their customers reside in more than one state.

9      81.    Credit Repair Cloud and Rosen have known or consciously avoided

10  knowing that CRC Users charge advance fees. They have knowledge or have consciously

11  avoided knowing that CRC Users charge advance fees because they actively encourage

12  the charging of advance fees.

13      82.    At least some CRC Users told Credit Repair Cloud employees that they

14  charged advance fees.

15      83.    In the podcast interview Rosen conducted with User A referenced in

16  paragraph 78, Rosen explained that he had reviewed User A's website and knew that

17  User A was charging customers monthly fees for credit-repair services.

18      84.    Through the back-end of the Software, Credit Repair Cloud employees,

19  including Rosen, can view Users' fee structures, which are outlined in the Software for

20  anyone enrolled in the integrated subscription billing service, as well as in Users'

21  individual customer contracts. Credit Repair Cloud employees in fact viewed CRC Users'

22  Software portals to provide User support, and employees, including Rosen, have

23  reviewed CRC Users' revenue to identify members of the Millionaire's Club.

24      85.    Users A, B, C, and D all charge consumers fees at the time of enrollment

25  and monthly recurring fees, and they were featured by Credit Repair Cloud or Rosen on

26  the Credit Repair Cloud website or other media after Credit Repair Cloud or Rosen

27

28

1    reviewed those Users' business models, websites, or information about those Users'

2    revenue that was contained in the Software.

3         86.    Through the Master Class and in training materials, Credit Repair Cloud and

4    Rosen have helped Users build their websites, reviewed websites created by CRC Users,

5    and provided template content for those websites. These websites routinely include

6    information regarding fee structure such as monthly fees and enrollment fees.

7                          **VIOLATIONS OF THE TSR**

8         87.    The Bureau is authorized to enforce the Telemarketing Act and the TSR

9    with respect to the offering or provision of a consumer-financial product or service

10   subject to the CFPA. 15 U.S.C. § 6105(d). A consumer-financial product or service is

11   defined by the CFPA to include, among other things, "providing financial advisory

12   services … including … credit counseling" and "collecting, analyzing, maintaining, or

13   providing consumer report information, including information relating to the credit

14   history of consumers." 12 U.S.C. § 5481(15)(A)(viii), (ix).

15        88.    The TSR defines a "seller" as "any person who, in connection with a

16   telemarketing transaction, provides, offers to provide, or arranges for others to provide

17   goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

18        89.    The TSR defines a "telemarketer" as "any person who, in connection with

19   telemarketing, initiates or receives telephone calls to or from a customer…." 16 C.F.R.

20   § 310.2(ff).

21        90.    The TSR defines "telemarketing" in relevant part as "a plan, program, or

22   campaign which is conducted to induce the purchase of goods or services … by use of

23   one or more telephones and which involves more than one interstate telephone call." 16

24   C.F.R. § 310.2(gg).

25        91.    Many CRC Users are engaged in "telemarketing" because they engaged in a

26   plan, program, or campaign through which they made telephone calls to, or received

27

28

telephone calls from, consumers in more than one state to induce those consumers to purchase credit-repair services. 16 C.F.R. § 310.2(gg).

92.   Many CRC Users are "sellers" under the TSR because, in connection with telemarketing transactions, they are persons who provide, offer to provide, or arrange for others to provide goods or services to consumers in exchange for consideration. 16 C.F.R. § 310.2(dd).

93.   Many CRC Users are "telemarketers" under the TSR because they are persons who, in connection with telemarketing, initiate or receive telephone calls to or from consumers residing in more than one state. 16 C.F.R. § 310.2(ff), (gg).

94.   It is an abusive telemarketing act or practice and a violation of the TSR for any seller or telemarketer to request or receive payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating, until:

      a.   the timeframe in which the seller has represented that all of the goods or services will be provided to that person has expired; and

      b.   the seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2).

95.   CRC Users have made representations to consumers that their credit-repair services would remove derogatory information from, or improve, the consumers' credit histories, credit record, or credit rating.

96.   CRC Users who telemarket their credit-repair services have routinely requested and received payment of a fee or consideration for their credit-repair services before:

AMENDED COMPLAINT

17

a. the timeframe in which they represented that all of the goods or services would be provided to consumers has expired; and

b. they provided consumers with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

### Count I

*Violations of the TSR by Credit Repair Cloud and Rosen*

97.    The Bureau re-alleges and incorporates by reference paragraphs 1–86.

98.    The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

99.    Credit Repair Cloud is a person under the TSR. 16 C.F.R. § 310.2(y).

100.    Credit Repair Cloud has provided substantial assistance or support to CRC Users by, among other things, providing CRC Users with telemarketing scripts; template marketing materials; training on credit repair; advice on how and when to collect fees; and the Software, which automatically flags negative items on consumers' credit reports, generates pre-populated dispute letters, integrates with other companies' subscription-billing systems to facilitate the collection of advance fees, and includes a CRM system.

101.    Credit Repair Cloud has known or consciously avoided knowing that CRC Users were engaged in telemarketing and were requesting and receiving fees from consumers for credit-repair services before providing consumers with documentation in the form of a consumer report from a consumer-reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved, in violation of the TSR. 16 C.F.R. § 310.4(a)(2).

102.    Rosen has participated directly in Credit Repair Cloud's provision of substantial assistance or support to CRC Users.

103.    Rosen, as the owner and CEO of Credit Repair Cloud, has had the authority to control, and he has controlled, Credit Repair Cloud's provision of substantial assistance or support to CRC Users.

104.    Rosen has known or has been recklessly indifferent to the fact that Credit Repair Cloud has been providing substantial assistance or support to CRC Users in violation of the TSR.

105.    Therefore, Credit Repair Cloud and Rosen have violated the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

## **Count II**

### *Violations of the TSR by Rosen*

106.    The Bureau re-alleges and incorporates by reference paragraphs 1–86.

107.    The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

108.    Rosen is a person under the TSR. 16 C.F.R. § 310.2(y).

109.    Rosen has provided substantial assistance or support to CRC Users by, among other things, conducting training on how to use the Software, how to convert prospective customers to paying customers, and how much to charge customers; emailing CRC Users with tips on how to remove items from consumers' credit reports; and providing CRC Users with telemarketing scripts and advice on how and when to collect fees.

110.    Rosen has known or consciously avoided knowing that CRC Users were engaged in telemarketing and were requesting and receiving fees from consumers for credit-repair services before providing consumers with documentation in the form of a

consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved violates the TSR. 16 C.F.R. § 310.4(a)(2).

111.   Therefore, Rosen has violated the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

## VIOLATIONS OF THE CFPA

### Count III

*Violations of the CFPA by Credit Repair Cloud and Rosen*

112.   The Bureau re-alleges and incorporates by reference paragraphs 1–86.

113.   Section 1036(a)(1)(A) of the CFPA provides that it is "unlawful for any covered person or service provider to offer or provide to a consumer a financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

114.   Under the CFPA, the term "service provider" means "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service." 12 U.S.C. § 5481(26).

115.   CRC Users are "covered persons" under 12 U.S.C. § 5481(6)(A) because they offer or provide a consumer-financial product or service for use by consumers primarily for personal, family, or household purposes. The services offered or provided by CRC Users consist of financial-advisory services, including credit counseling, and "collecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers …." 12 U.S.C. § 5481(15)(A)(viii), (ix).

116.   Credit Repair Cloud and Rosen are "service providers" under 12 U.S.C. § 5481(26) because they participate in designing, operating, or maintaining CRC Users'

provision of credit-repair services, and they therefore provide a material service to CRC Users.

117.   The TSR is a federal consumer-financial law, as defined by the CFPA. 12 U.S.C § 5481(14); 15 U.S.C § 6105(d).

118.   Therefore, Credit Repair Cloud's and Rosen's violations of the TSR, described in Counts I and II, constitute violations of section 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

# DEMAND FOR RELIEF

WHEREFORE, the Bureau requests, under 12 U.S.C. § 5565, that the Court:

a.      impose appropriate injunctive relief against Credit Repair Cloud and Rosen for their violations of the TSR and the CFPA;

b.      grant additional injunctive relief as the Court may deem to be just and proper;

c.      award monetary relief against Defendants, including but not limited to the refund of monies paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

d.      award the Bureau civil money penalties;

e.      award the Bureau the costs of bringing this action; and

f.      award such other and additional relief as the Court may determine to be just and proper.


Dated: January 7, 2022


Respectfully submitted,

/s/ *Amanda J. Krause*
Amanda J. Krause (Admitted *pro hac vice*)
Joyce Chen (Admitted *pro hac vice*)
Jeffrey Blumberg (Admitted *pro hac vice*)
Leanne E. Hartmann (local counsel)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G St., NW
Washington, DC 20552

*Attorneys for Plaintiff Consumer Financial Protection Bureau*