UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Daniel A. Rosen, Inc. et al.,<br><br>　　　　　Defendants. | Case No. 2:21-cv-07492-VAP-(JDEx)<br><br>**Order DENYING<br>Motion to Dismiss (Doc. No. 38)** |

　　Defendants Daniel A. Rosen, Inc. et al. ("Defendants") filed a Motion to Dismiss ("Motion") on January 28, 2022.  (Doc. No. 38.)  Plaintiff Consumer Financial Protection Bureau ("Plaintiff" or "CFPB") opposed the Motion on February 28, 2022.  (Doc. No. 39.)  Defendants replied on March 14, 2022.  (Doc. No. 40.)

　　After considering all papers filed in support of, and in opposition to, the Motion, the Court **DENIES** the Motion to Dismiss.

## I.　　BACKGROUND

　　Daniel Rosen ("Rosen") owns Daniel A. Rosen, Inc. d.b.a Credit Repair Cloud ("Credit Repair Cloud").  (FAC ¶¶ 1, 7.)  Credit Repair Cloud markets and sells products and services for people to start their own credit-repair business ("CRC Users").  (Id. ¶¶ 6, 11.)  With Credit Repairs Cloud's

1

assistance, CRC Users provide services to consumers "to remove derogatory information from, or improve, a consumer's credit history, credit record, or credit rating." (*Id.* ¶¶ 8, 11.)

Plaintiff alleges Defendants provided substantial assistance to CRC Users in telemarking, and charging advance fees for, credit-repair services in violation of the Telemarketing Act, the Telemarketing Sales Rule ("TSR"), and the Consumer Financial Protection Act of 2010 ("CFPA"). (*Id.* ¶¶ 1-2, 8-10, 16-28, 50-72.) Accordingly, Plaintiff asserts claims for violation of the TSR and of the CFPA, against Defendants. (*Id.* ¶¶ 97-118.) Defendants filed a motion to dismiss all the claims. (Doc. No. 38.)

## II.   LEGAL STANDARD

### A.   Motion to Dismiss Pursuant to Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005); *ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1096 (9th Cir. 2005); *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). "The court need not accept as true, however, allegations that contradict facts that may

be judicially noticed by the court." *Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

Although the scope of review is limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990), and "take judicial notice of matters of public record outside the pleadings," *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).

### III.   JUDICIAL NOTICE

In connection with the Motion, Defendants request the Court take judicial notice of the November 7, 2019, Letter from Congress to CFPB Associate Director Bryan A. Schneider. (Doc. No. 38-2.) The Court GRANTS the request as the letter is a government record. *See Lifeway Foods, Inc. v. Millenium Prods., Inc.*, No. 16-7099, 2016 WL 7336721, at *1

(C.D. Cal. Dec. 14, 2016) ("Publicly available government records are commonly subject to judicial notice.").

## IV. DISCUSSION

### A. Plaintiff Has Authority to Pursue Enforcement Action Against Defendants

As a preliminary matter, Defendants argue that Plaintiff has no authority to pursue enforcement actions against them because CRC Users are not "covered persons" as defined by the CFPA. (Motion at 5-8.) Defendants cite nonbinding authority, *Jackson v. Tel. Chrysler Jeep, Inc.*, No. 07-10489, 2009 WL 928224, at *6 (E.D. Mich. Mar. 31, 2009), to support their contention that CRC Users provide only retrospective credit-repair services and thus do not provide prospective consumer financial services under the CFPA. (*Id.* at 6-7.)

Defendants' arguments are unpersuasive. A "covered person" is "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). The CFPA defines a "consumer financial product or service," in part, as "providing financial advisory services . . . including [] providing credit counseling to any consumer," *id.* at § 5481(15)(A)(viii), or "collecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers, used or expected to be used in connection with any decision regarding the offering or provision of a consumer financial product or service," *id.* at § 5481(15)(A)(ix).

4

As to the interpretation of section 5481(15)(A)(viii), Defendants' reliance on *Jackson* is misplaced. (Motion at 6.) The *Jackson* court noted a distinction between credit counseling and credit-repair services under the Credit Repair Organizations Act ("CROA"), not under the CFPA. *See* 2009 WL 928224, at *6 (citing *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 274 (D. Mass. 2008)). Moreover, the *Jackson* court misstated *Zimmerman* when relying on this proposition. The *Zimmerman* court, in fact, cautioned against such a mechanical distinction given the CROA's broad purpose and expansive language. 529 F. Supp. 2d at 274-75. As the CFPA also has a broad purpose and expansive language, *see* 12 U.S.C. §§ 5536(a), 5564, 5565, the Court declines to draw such a mechanical distinction here. Accordingly, CRC Users' services to improve or repair their credit is sufficient to show credit counseling as defined under section 5481(15)(A)(viii). (*See* FAC ¶¶ 34, 37, 58); *see also See CFPB v. Glob. Fin. Support, Inc.*, No. 15-2440, 2021 WL 242939, at *8 (S.D. Cal. Jan. 25, 2021) (offering financial aid application guidance booklets is a "financial advisory service"); *CFPB v. Access Funding, LLC*, 270 F. Supp. 3d 831, 845–46 (D. Md. 2017) ("[O]ne who 'provides financial advisory services . . . to consumers on individual financial matters is a 'covered person,' regardless of the specific nature of that financial advice").

CRC Users also are "covered persons" under section 5481(15)(A)(ix). The FAC alleges that CRC Users provided consumers' credit history to "help consumers get approved for a mortgage or auto loan or help reduce loan interest rates," (FAC ¶ 34), and thus CRC Users "fall[] squarely within the definition of 'covered person' as it is defined under CFPA." *CFPB v. Prime*

*Mktg. Holdings, LLC*, No. 16-07111, 2016 WL 10516097, at *8 (C.D. Cal. Nov. 15, 2016) ("As Plaintiff's Complaint alleges that Defendant is in the business of providing consumer report information about consumers' credit history, Defendant falls squarely within the definition of 'covered person' as it is defined in the CFPA.")

Defendants next contend they are not "service providers" under the CFPA.  (Motion at 5-8.)  Defendants cite *CFPB v. D & D Mktg.*, No. 15-9692, 2016 WL 8849698, at *8 (C.D. Cal. Nov. 17, 2016), and *CFPB v. Universal Debt & Payment Sols., LLC*, No. 15-00859, 2015 WL 11439178, at *16 (N.D. Ga. Sept. 1, 2015), to argue their services fall under the exemption for those providing only ministerial, support services to CRC Users.  (*Id.* at 7-8.)

Under the CFPA, a "service provider" is "any person that [sic] provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that participates in designing, operating, or maintaining the consumer financial product or service." 12 U.S.C. § 5481(26)(A).  The CFPA excludes, however, a person who provides "a support service of a type provided to businesses generally or a similar ministerial service."  *Id.* at § 5481(26)(B)(i).

Defendants here are "service providers."  First, "[Defendants have] reason to know the dynamics of the trade" as their services are specific to CRC Users' credit-repair business and not to businesses generally.  (FAC ¶ 11), *see also D & D Mktg.*, 2016 WL 8849698, at *8.  Second, Defendants'

argument that they must have an *obligation* to vet and monitor any CRC User to show material support lacks merit.  (Motion at 8.)  Defendants need only have the *capacity* to vet and monitor CRC Users, and they have it here as they "can view [CRC] Users' fee structures, [and] . . . [CRC] Users' individual customer contracts" through the back-end of Defendants' Software.  (FAC ¶ 84); *D & D Mktg.*, 2016 WL 8849698, at *8 (finding defendants were "service providers because, in part, they had the "*capacity* . . . to vet and monitor 'covered persons.'") (emphasis added).  And third, Defendants exercised "discretion, judgment, and skill" when providing support and services to CRC Users on how to achieve success in a credit-repair business. (FAC ¶¶ 15, 23-24, 31, 52-53, 58, 61-62, 84); *Universal Debt*, 2015 WL 11439178, at *16.  Without Defendants' Software and services, CRC Users "could not have succeeded in their scheme." *Universal Debt*, 2015 WL 11439178, at *16.  Accordingly, Defendants provided materials services to CRC Users and thus are "service providers."

### B. The CROA Does Not Supersede the TSR

The Court next addresses another threshold matter: whether the CROA supersedes the TSR.  According to Defendants, the TSR's "advanced fee" rule, a regulation providing that a credit repair company cannot collect payment until at least six months after the company's "promised results have been achieved," conflicts with the CROA, a statute permitting credit repair organizations to charge monthly fees.  (Motion at 20-23.)

Although Defendants cite a November 7, 2019, Letter from Congress to CFPB Associate Director Bryan A. Schneider ("Letter"), this Letter is unpersuasive as it provides no support as to whether the CROA in fact conflicts with the TSR. (Doc. No. 38-2.) Moreover, the *CFPB v. Commonwealth Equity Grp., LLC*, court rejected a similar argument:

> "[A]lthough the [CROA] undoubtedly governs Defendant's business, there is no language in that statute indicating that Defendant's telemarketing activities may not simultaneously be regulated by the Telemarketing Act." *Tennessee v. Lexington Law Firms*, No. 96-CV-0344, 1997 WL 367409, at *6, 1997 U.S. Dist. LEXIS 7403, at *17 (M.D. Tenn. May 14, 1997). As plaintiffs note, compliance with the TSR's payment requirements would not cause defendants to violate the CROA. The TSR simply adds a precondition to requesting payment, namely that the organization provide proof that the services were rendered more than six months after performance.

> Defendants maintain that where a statute and a regulation provide restrictions of differing degrees, there is conflict preemption. Their reply brief cites several judicial decisions that a subsequently enacted statute superseded a prior inconsistent regulation. However, in each of those cases, it was impossible to comply with both the statute

    and the regulation. (footnote omitted). That is not the sit-
    uation here. The TSR and the CROA thus do not conflict.

No. 20-10991, 2021 WL 3516690, at *2 (D. Mass. Aug. 10, 2021); see also *Prime Mktg. Holdings*, 2016 WL 10516097, at *9 ("when a business is both a credit repair agency and a telemarketer, it is required to comply with both the CROA and the TSR. On the other hand, if a credit repair agency does not qualify as a telemarketer, then it need not comply with the TSR—only the CROA is applicable. . . . Thus, the two provisions may be complied with concurrently; they do not conflict."). Accordingly, the CROA does not conflict with, or supersede, the TSR.

### C. Claim 1 and Claim 2 Sufficiently Pled

  The Court now turns to Plaintiff's First and Second Claims. Defendants first argue that Plaintiff cannot allege Defendants provided substantial assistance to CRC Users in violation of the TSR. (Motion at 9.) According to Defendants, the FAC fails to allege a causal connection between Defendants' services and the CRC Users' TSR violations under aider-abettor principles from securities laws. (*Id.* at 9-17.) Defendants also contend that Plaintiff cannot establish Defendants knew, or consciously avoided knowledge, of CRC Users' TSR violations. (*Id.* at 17-19.)

  The TSR prohibits a person from "provid[ing] substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c), or (d), or § 310.4" of the TSR. 16

C.F.R. § 310.3(b). To show a violation under this section, a plaintiff must establish three elements: "(1) there must be an underlying violation of the TSR; (2) the person must provide substantial assistance or support to the seller or telemarketer violating the TSR; and (3) the person must know or consciously avoid knowing that the seller or telemarketer is violating the TSR." *FTC v. Lake*, 181 F. Supp. 3d 692, 700-01 (C.D. Cal. 2016). Defendants do not dispute the first element, and thus the Court addresses the second and third elements only.

1. Substantial Assistance

Under the second element, "[t]he threshold for what constitutes substantial assistance is low," *Lake*, 181 F. Supp. 3d at 699, 701, and requires showing only more than "mere causal or incidental" assistance to the telemarketer. Telemarketing Sales Rule, 60 Fed. Reg. 43842, 43852 (Aug. 23, 1995); *see also FTC v. HES Merch. Servs. Co. I*, No. 12-1618, 2014 WL 6863506, at *7 (M.D. Fla. Nov. 18, 2014) ("The threshold for substantial assistance is not nearly as high as UPS seems to believe. The FTC must identify something more than casual or incidental help to the telemarketer, but does not have to show a direct connection between the assistance and the misrepresentation for an entity to be liable under § 310.3(b).") (internal quotations and citation omitted). Although it is true that the Federal Trade Commission ("FTC") invoked securities law in promulgating the TSR, *see* Telemarketing Sales Rule, 60 Fed. Reg. at 43851 n.97, it also rejected any requirement that the assistance be "'related to the commission or furtherance' of a core rule violation." *Id.* at 43851; *see also FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) ("Although the

originally proposed [TSR] would have applied only where 'such substantial assistance is related to the commission or furtherance of that act or practice,' the FTC rejected this requirement in the final rule."). Thus, Defendants' reliance on aider-abettor principles under securities laws is misplaced. (Motion at 10-14); *see also Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003); *cf. FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240-41 (11th Cir. 2017) (applying aider-abettor principles only to determine whether to impose joint and several liability for TSR violations). Plaintiff need only establish more than causal or incidental assistance to the CRC Users, not a direct connection between the assistance and the TRC violations.

      The FAC here alleges facts sufficient to establish Defendants' substantial assistance to CRC Users. According to the FAC, Defendants supplied CRC Users with "EVERYTHING" needed to "start a . . . credit repair business!" (FAC ¶ 11.) For example, Defendants provided to CRC Users "telemarketing sales scripts, template marketing materials, and customizable website templates . . . printable pamphlets, fliers, and business cards" to use in telemarketing, (FAC ¶¶ 23-27), the same items the FTC listed as examples of substantial assistance under the TSR. *See* Telemarketing Sales Rule, 60 Fed. Red. at 43852 ("providing any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing"). Defendants also provided CRC Users with the following: trainings that encouraged CRC Users to engage in telemarketing their credit-repair services and charge advance fees; review of CRC Users' websites; assistance in answering CRC Users' questions about legal

compliance issues related to credit repair; and Defendants' Software to manage customers. (FAC ¶¶ 11, 24, 27-28, 52-59, 61-65, 71, 86, 100, 109); *see also Chapman*, 714 F.3d at 1216 (finding substantial assistance when Defendant "assisted the Kansas defendants in numerous other ways: helping develop the questionnaire the telemarketers used to obtain information from grant-seeking customers; training a sales group on processing grant research requests; assisting in responding to inquiries from different state attorneys general; providing the Kansas defendants with justifications and explanations to deal with consumer complaints; brainstorming ways for them to collectively expand their business; and so forth."). Defendants' assistance thus was not minimal as, absent these trainings and tools, CRC Users would have been unable to engage in telemarketing their credit-repair services and in charging advance fees in violation of the TSR. *See FTC v. HES Merch. Servs. Co. II*, No. 12-1618, 2016 WL 10880223, at *5 (M.D. Fla. Oct. 26, 2016) ("The act of UPS providing TYS with two merchant accounts was essential to the success of the scheme, and absent these merchant accounts, the TYS Defendants would have been unable to process credit card payments; thus, UPS substantially assisted the TYS Defendants.")

Finally, Defendants' contention that Mr. Rosen's "blog posts," "book," and "podcast" cannot form the basis for liability under the First Amendment is unpersuasive. (Motion at 14-16.) Even assuming, without deciding, that this was true, sufficient other activities, *supra*, form the basis of Defendants' substantial assistance. *See generally Chapman*, 714 F.3d at 1217 ("the fact that [Defendant's] conduct did not fit precisely into the FTC's non-exclusive

list or the fact patterns of previous cases does not prevent a finding that she provided substantial assistance to the [] telemarketers through her actions. The FTC and courts have not purported to create an exhaustive list of activities that establish substantial assistance, and the law does not provide a special exemption for the first individual to come up with a novel way of assisting telemarketers.").

### 2. Knowledge or Conscious Avoidance

The Court now addresses the third element necessary to show substantial assistance: whether Defendants knew or consciously avoided knowing that the CRC Users violated the TSR. According to Defendants, the FAC fails to allege that Defendants knew CRC Users were both telemarketing and charging advance fees, or that CRC Users were violating the TSR. (Motion at 18.) Defendants argue also that Defendants' ability to view CRC users' fee structure cannot impute knowledge of TSR violations. (*Id.* at 19.)

"[T]aking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability." *Chapman*, 714 F.3d at 1219 (international quotations and citation omitted). Courts have found it is sufficient to establish knowledge, or conscious avoidance, of the prohibited practice, and not of the TSR violation. *See Chapman*, 714 F.3d at 1217-19; *see also Lake*, 181 F. Supp. 3d at 701 (describing the defendant's knowledge of prohibited conduct and not discussing the defendant's knowledge of the TSR).

The FAC here alleges sufficient facts that Defendants knew, or consciously avoided knowing, that CRC Users were both telemarketing their credit-repair services and charging advance fees. Defendants' argument that CRC Users may not have violated the TSR because they may have met customers face-to-face is unpersuasive as the FAC alleges specific instances where Defendants knew of the prohibited conduct. (Motion at 18.) For example, CRC User A discussed their "telemarketing tactics with Rosen," Credit Repair Cloud's owner, and "Rosen knew that User A was charging customers monthly fees for credit-repair services" after reviewing User A's website. (FAC ¶¶ 78, 83); (*see also* FAC ¶¶ 37, 50-59, 77, 84-86.) These allegations are the type of "red flags" that should have prompted Defendants to investigate CRC Users' conduct. *HES Merch. Servs. II*, 2016 WL 10880223, at *5; *see also United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 929 (C.D. Ill. 2017), *aff'd in part, vacated in part, remanded sub nom. United States v. Dish Network LLC*, 954 F.3d 970 (7th Cir. 2020) ("The most telling evidence is that Dish's Outbound Operations' Manager Bangert knew about Star Satellite's [prohibited conduct].") Moreover, Defendants' entire business model was built around encouraging CRC Users to engage prospective customers by telephone and charge advance fees for their credit-repair services, and Rosen knew it, *supra*. *See also Lake*, 181 F. Supp. 3d at 701 ("Fraud was the HOPE Defendants' business model, and Lake knew it.").

Defendants' final argument that their ability to view CRC Users' fee structure is insufficient to establish knowledge also lacks merit. (Motion at 19.) The FAC alleges not only that Defendants have this ability, but also

that they used the back-end of the Software to, in part, "review[] CRC Users' revenue to identify members of the Millionaire's Club." (FAC ¶¶ 61-62, 83-84.) The Court thus can "draw the reasonable inference" that Defendants, at a minimum, consciously avoided knowing CRC Users engaged in prohibited conduct that violated the TSR. *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

Accordingly, the Court DENIES Defendants' Motion to Dismiss as to Claims 1 and 2.

### D. Claim 3 Sufficiently Pled

Defendants lastly argue that Plaintiff cannot assert the Third Claim because it is derivative of the First and Second Claims. (Motion at 20.) Alternatively, Defendants contend that they are not "service providers" and that CRC Users are not "covered persons," and thus Plaintiff's Third Claim fails. (*Id.*)

As the Court determined that Plaintiff pleaded sufficiently Claims 1 and 2, that Defendants are "service providers," and that CRC Users are "covered persons," *supra*, Defendants' arguments as to Claim 3 lack merit.

The Court thus DENIES Defendants' Motion to Dismiss as to Claim 3.

//
//

## V. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' Motion to Dismiss. Defendants shall file and serve their answer no later than April 22, 2022.

**IT IS SO ORDERED.**

Dated: 4/5/22

Virginia A. Phillips
United States District Judge