Amanda J. Krause (NY Reg. #5323357)
Tel.: (202) 445-8767 / Email: Amanda.Krause@cfpb.gov
Joyce Chen (NY Reg. #4717245)
Tel.: (202) 702-4226 / Email: Joyce.Chen@cfpb.gov
Jeffrey Blumberg (MD Bar)
Tel.: (202) 435-9687 / Email: Jeffrey.Blumberg@cfpb.gov
Daniel Cheriyan (NY Reg. #5119656)
Tel: (202) 451-1300 / Email: Daniel.Cheriyan@cfpb.gov
Carl L. Moore (MD Bar)
Tel.: (202) 853-6751 / Email: Carl.Moore@cfpb.gov
Jennifer B. Yadoo (DC Bar #1780435)
Tel.: (202) 322-7346 / Email: Jennifer.Yadoo@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-7722

Leanne E. Hartmann (CA Bar #264787) – Local Counsel
E-mail: Leanne.Hartmann@cfpb.gov
Phone: (415) 844-9787
301 Howard St., Suite 1200
San Francisco, CA  94105
Fax: (415) 844-9788

*Attorneys for Plaintiff Consumer Financial Protection Bureau*

\**Attorneys for Defendant listed on the following page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau, | ) Case No.: 2:21-cv-07492-VAP-JDE |
| Plaintiff, | ) **Joint Stipulation Regarding Plaintiff's Motion to Compel Production of User Data** |
| vs. | ) |
| Daniel A. Rosen, Inc., d/b/a Credit Repair Cloud, *et al.*, | ) Motion Hearing: 01/05/2023 at 10:00am ) Judicial Officer: Hon. John D. Early ) Discovery Cutoff: 04/27/2023 |
| Defendants. | ) Pretrial Conference: 07/24/2023 ) Trial: 08/01/2023 |

i

Joshua Briones (SBN 205293)
jbriones@mintz.com
E. Crystal Lopez (SBN 296297)
eclopez@mintz.com
Matthew J. Novian (SBN 324144)
mjnovian@mintz.com
Grecia A. Rivas (SBN 333971)
garivas@mintz.com
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
2049 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

*Attorneys for Defendant Daniel A. Rosen, Inc., d/b/a Credit Repair Cloud*

# TABLE OF CONTENTS

I.   INTRODUCTORY STATEMENTS ..................................................1

   A.   The Bureau's Introductory Statement .....................................1

   B.   CRC's Introductory Statement ..............................................3

II.  ISSUE IN DISPUTE ....................................................................4

III. THE BUREAU'S STATEMENT OF DISPUTE...........................9

   A.   Factual Background................................................................9

     1.   The meet and confer process ..........................................9

     2.   The Bureau's effort to understand CRC's burden objection ................10

   B.   Argument...............................................................................12

     1.   Relevance to claims....................................................13

     2.   Relevance to remedies................................................15

     3.   CRC's objections........................................................18

   C.   Requested relief....................................................................22

IV. CRC'S STATEMENT OF DISPUTE ........................................22

   A.   Factual Background................................................................22

     1.   Compiling Data Responsive to Request No. 1 Related to 99 CRC Users Was Burdensome on CRC Employees .....................................................23

     2.   The Bureau Has Already Received Over Half a Million Pages Related to CRC Users ..............................................................25

     3.   Data Responsive to Request No. 1 Does Not Include Evidence of Telemarketing or Advance Fees Paid to CRC Users .....................................25

     4.   The Bureau's Modified Request .....................................28

   B.   Argument...............................................................................29

     1.   The Bureau Overstates the Relevancy of the Data Requested..............29

       i.   CRC's Database Does Not Contain Evidence Relevant to Claims .......29

ii.   CRC's Database Does Not Contain Evidence Relevant to Remedies 32

2.   Requiring CRC to Produce an Entire Database is Overbroad and Unduly Burdensome ................................................................................................34

3.   The Request For The Entire Database Is Not Proportional To The Needs Of The Case ................................................................................................36

4.   The Burden and Expense of the Bureau's Request Outweigh the Benefits ..........................................................................................................39

5.   The Bureau's Funding Apparatus Contravenes the Appropriations Clause and it Cannot Continue this Action ...................................................41

C.   Defendants' Conclusion ..........................................................................42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Pursuant to Rule 37 of the Federal Rules of Civil Procedure and Rule 37

2  of the Local Rules of this Court, Plaintiff Consumer Financial Protection

3  Bureau (Bureau) and Defendant Daniel A. Rosen, Inc., d/b/a Credit Repair

4  Cloud (CRC) hereby submit the following Joint Stipulation in connection with

5  Plaintiff's Motion to Compel Production of User Data. The Bureau attempted

6  unsuccessfully to resolve the dispute addressed herein and therefore respectfully

7  seeks the assistance of the Court.

8  **I.    INTRODUCTORY STATEMENTS**

9      **A.    The Bureau's Introductory Statement**

10     The Bureau has alleged that CRC provided substantial assistance[1] to

11  many credit-repair businesses (hereinafter referred to as CRC Users or Users)

12  who were violating the Telemarketing Sales Rule (TSR), 16 C.F.R. §§ 310.1 *et*

13  *seq*., and the Consumer Financial Protection Act (CFPA), 12 U.S.C. §§ 5301, *et*

14  *seq*., by telemarketing and charging illegal advance fees.[2] The primary way that

15  CRC substantially assisted its Users was through the CRC software, which

16  provided, among other things, a customer-relationship management system that

17  allowed Users to track consumer details (like their name and contact

18

19

20

---

21  [1] As the Court previously stated, "the threshold for what constitutes substantial
    assistance is low . . . and requires showing only more than mere causal or
22  incidental assistance to the telemarketer." *CFPB v. Daniel A. Rosen, Inc.*, 2022
    WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) (internal edits, quotations and
23  citations omitted). Of course, CRC provides its Users far more than mere causal
    or incidental assistance as it advertises that it offers its Users "EVERYTHING
24  [they] need to start a . . . credit repair business!" *See* Declaration of Amanda J.
    Krause, attached as **Exhibit A**, ¶ 2; First Amended Complaint, ECF No. 32,
25  attached as **Exhibit B**, ¶ 11; Amended Answer, ECF No. 49, attached as
    **Exhibit C**, ¶ 11.
26
27  [2] *See generally* Exhibit B.

28

1

information), the date that the consumers signed up for credit-repair services, and consumer billing information.[3]

Two key factual issues in this case are: (1) the scope of the violations, i.e., how many Users were telemarketing and charging advance fees; and (2) the amount of consumer harm, i.e., how many and which consumers were charged advance fees and how much did they pay. These factual issues go to more than just establishing CRC's violations—they are central to determining the appropriate remedies for those violations. Here, as relevant to this motion, the Bureau is seeking a substantial civil penalty (potentially in the tens of millions of dollars), restitution, refund of moneys or damages for all consumers that were charged illegal advance fees, and a permanent injunction that would, among other things, ban Defendants from assisting credit-repair businesses.

The scope of violations and amount of consumer harm are potentially massive. CRC boasts on its webpage that it has more than 23,000 "Credit Heroes," changed more than 12.9 million lives, and processed more than $197 million.[4] These three figures appear to represent the number of Users, the number of consumers, and the amount of fees collected by Users, respectively. The Bureau believes that many of the Users—perhaps hundreds or thousands of them—are telemarketing and charging advance fees because that is the business model that CRC promotes.[5]

To identify all of the Users that are violating the TSR, and all of the consumers who were harmed by paying illegal advance fees, the Bureau served Request for Production No. 1 seeking all of the User data contained in the CRC

---

[3] *See* Exhibit B, ¶¶ 16; Exhibit C, ¶ 16; Exhibit A, ¶ 10; Defendant Daniel A. Rosen, Inc. d/b/a Credit Repair Cloud's Responses to Plaintiff's First Interrogatories dated August 12, 2022, attached as **Exhibit J**, at 5-6.

[4] https://www.creditrepaircloud.com/ (last accessed on November 2, 2022).

[5] *See* Exhibit B, ¶¶ 23-25, 50-72; Exhibit C, ¶¶ 23-25, 50-72.

database. The Bureau has since narrowed its request to seek all data stored on the CRC database concerning Users, except for any data fields that contain actual email or chat messages between Users and consumers or any data fields that contain actual consumer report information. The Bureau acknowledges that this request, even as narrowed, seeks almost CRC's entire database, but as discussed in the sections below, the data is crucial for the Bureau's claims and remedies as it is the only way that the Bureau can realistically develop facts to show the scope of CRC's violations and the total amount of consumer harm. The Bureau has retained an expert to assist it in analyzing the data and establishing a methodology for identifying those Users that were telemarketing and charging advance fees.[6] That work cannot begin until CRC produces the User data.

CRC has refused to provide its database, raising a few general objections, most notably that it would be unduly burdensome and not proportional to the needs of the case. But CRC has not and cannot support its objections as it should be easy (just clicking a few buttons) to back up the data and produce it to the Bureau, and the data is essential to establish both the scope of Defendants' liability and the proper remedies.[7] Thus, there is no legal basis for CRC to withhold this crucial data.

**B.    CRC's Introductory Statement**

Defendants understand their discovery obligations; however, the Bureau's challenges to Defendants' response to RFP 1 are oversimplified and lack context. Altogether, the Bureau has received over a million pages of documents in this case, in addition to hundreds of documents obtained during its pre-suit investigation of Defendants. Remarkably, the Bureau wants even

---

[6] *See* Declaration of Michael J. Petron, attached as **Exhibit O**, ¶¶ 5, 14.

[7] *See id.* at ¶ 10.

3

more data from Defendants. As part of its productions, Defendants produced 514,633 pages directly related to Plaintiff's broad requests for information pertaining to 99 CRC Users. Plaintiff has also received information from deposition and document subpoenas served thus far to third parties. Despite Defendants' good faith attempts to fulfill their discovery obligations and cooperate with Plaintiff to narrow the scope of RFP 1, the Bureau's push to obtain all of CRC's database is overbroad, unduly burdensome, and is not proportional to the needs of the case. The Bureau's attempt to obtain a company's entire database is a fishing expedition and cannot be allowed.

## II.   ISSUE IN DISPUTE

The discovery request in dispute is the Bureau's Request for Production No. 1 as modified. The Bureau's initial and modified requests, as well as CRC's initial and supplementary responses, are set forth below.

### The Bureau's Initial Request for Production No. 1
### (Served on April 7, 2022)

1.   All Documents and data stored on the Credit Repair Cloud Software[8] Concerning data of Users including:

    a.   The identity and contact information of Users (e.g., User profiles and contact information files);

    b.   The identity and contact information of Consumers who paid any User for Credit-Repair Services;

    c.   Payment history for Consumers who paid any User for Credit-Repair Services;

---

[8] In its requests, the Bureau defined "Credit Repair Cloud Software" to mean "the customer-relationship-management software offered or provided by the Company to Users." For clarity, in this Joint Stipulation, the Bureau refers to it as the CRC database.

    d.  Each unique version of any written agreements between any Users and Consumers that signed up for the User's Credit-Repair Services;

    e.  Communications between Users and Consumers contained or reflected in the Credit Repair Cloud Software, including but not limited to electronic mail or messages, and call notes;

    f.  Complaints from Consumers; and

    g.  Fees charged to Consumers, including reflecting the method of payment (ACH or credit card), amount of the fees, and payment schedule.[9]

**The Bureau's Modified Request for Production No. 1**

**(Modified on October 21, 2022)**

[A]ll data stored on the Credit Repair Cloud Software concerning Users, except for the following:

- Any data fields that contain actual email or chat messages between CRC Users and Consumers. We have identified two tables from the data dictionary your client provided of the CRC database that potentially contains such communications: 4.25 crd_client notes table and 4.47 crd_messages table. Accordingly, please exclude these two tables as well as any other data fields that contain such information.

- Any data fields that contain actual consumer report information.[10]

[9] Exhibit A, ¶ 3; Plaintiff's First Request for Production of Documents to Defendant Daniel A. Rosen, Inc., d/b/a Credit Repair Cloud dated April 7, 2022, attached as **Exhibit D**, at 6-7.

[10] *See* Exhibit A, ¶ 13; Email Chain between the Bureau and CRC regarding CFPB v. Credit Repair Cloud – RFP 1 dated October 21 – October 31, 2022, attached as **Exhibit M**, at 2. The Bureau's expert has since identified one table that appears to contain actual consumer report information: 4.32 crd_cr_source table. *See* Exhibit O at 3 n.2. Accordingly, the Bureau asks that CRC also exclude that table from its production. If CRC identifies additional data fields or

**CRC's Initial Response to Request for Production No. 1**

**(Served on May 13, 2022)**

Defendant incorporates by reference its Preliminary Statement and General Objections. Defendant objects that this request is compound and thus imposes discovery obligations that exceed those set forth in the Federal Rules of Civil Procedure. Defendant further objects to this request because it is overly broad to the extent it seeks "All Documents" and "each unique version of any written agreements." Defendant also objects to the extent that the request seeks information, the disclosure of which would constitute an unwarranted invasion of the affected persons' constitutional, statutory and/or common-law rights of privacy and confidentiality. Defendant also objects because the request is unduly burdensome to the extent it requires Defendant to search for "all Documents" concerning seven categories of information, including "each unique version of any written agreements." Defendant further objects to this request on the grounds that the burden or expense of this request outweighs its likely benefit, considering the needs of the case and defendant's resources. Defendant further objects to this request to the extent it seeks information not in Defendant's possession, custody, or control, but rather in CRC Users' possession, custody or control.[11]

---

tables that contain actual email or chat messages between Users and consumers or actual consumer report information, the Bureau would, of course, confer with CRC to ensure that deleting the additional data fields or tables did not substantially increase its burden.

[11] Exhibit A, ¶ 4; Defendant Daniel A. Rosen, Inc.'s Responses to Plaintiff's First Request for Production of Documents dated May 13, 2022, attached as **Exhibit E**, at 6-7.

**CRC's Amended Response to Request for Production No. 1**
**(Served on August 19, 2022)**

Defendant incorporates by reference its Preliminary Statement and General Objections. Defendant objects that this request is compound and thus imposes discovery obligations that exceed those set forth in the Federal Rules of Civil Procedure. Defendant further objects to this request because it is overly broad to the extent it seeks "All Documents and data stored on the Credit Repair Cloud Software Concerning data of Users." Defendant also objects that the request is overly broad and unduly burdensome because it requires Defendant to search for and compile unlimited amounts of documents and data for thousands of Users; such a request is the equivalent of requiring Defendant to produce the entire CRC database, which is overbroad and unduly burdensome. *See e.g. Brunston v. Bayer Healthcare Pharms., Inc.*, No. EDCV131904FMODTBX, 2014 WL 12587032, at *5 (C.D. Cal. May 16, 2014). Defendant further objects to this request on the grounds that it imposes an undue burden on Defendant's employees – who would need to spend weeks (if not months) compiling responsive data and documents to this request – which outweighs its likely benefit. Defendant also objects to the extent that the request seeks information such as social security numbers, credit reports, and other similar information, the disclosure of which would constitute an unwarranted invasion of the affected persons' constitutional, statutory and/or common-law rights of privacy and confidentiality.

Without waiving and subject to the foregoing objections, Defendant responds as follows: As agreed upon by the parties, Credit Repair Cloud has conducted a diligent search for and is producing documents and data responsive to Request No. 1 (with the modification to subpart 1(e) to request only call notes), in its possession, custody or control, for the CRC Users that are

members of the Millionaire's Club, and the Users identified in the attachment to the Bureau's July 5, 2022 email.[12]

### CRC's Supplemental Response to Request for Production No. 1
### (Sent via email on October 31, 2022)

Regarding your request – because the "Bureau's funding mechanism violates the Constitution's separation of powers" it cannot continue with this enforcement action against Defendants. *Community Financial Services Association v. CFPB*, 2022 U.S. App. LEXIS 29060, at *32. Here, as in *Community Finance*, the Bureau is using unconstitutional funding to prosecute this case. Rather than seeking the below, the Bureau has an obligation to "rewind [its] action" as a remedy for the Bureau's unconstitutional wielding of its enforcement power. *Id*. at *51.

Even if the Bureau was permitted to proceed, the Credit Repair Cloud software does not have an autodialer feature and does not record when a CRC User has made a phone call to a prospective customer. Although the CRC database may contain some information regarding fees charged by some CRC Users, there is no way to identify "advance fees."

Therefore, contrary to the Bureau's assertion, the database does not contain "highly relevant" information related to the Bureau's claims in this litigation. Production of the entire CRC database is not proportional to the needs of this case.[13]

---

[12] Exhibit A, ¶ 11; Defendant Daniel A. Rosen, Inc.'s Amended Responses to Plaintiff's First Request for Production of Documents dated August 19, 2022, attached as **Exhibit L**, at 6-7.

[13] Exhibit M at 1.

### III.    THE BUREAU'S STATEMENT OF DISPUTE

####    A.    Factual Background

#####       1.  The meet and confer process

The Bureau has taken numerous steps—exhausting Local Rule 37-1's meet and confer process as well as taking discovery into CRC's burden objection—to avoid bringing this dispute to the Court. For example, after CRC responded to Request for Production No. 1 with general and unsupported objections, the Bureau met and conferred with CRC on May 24th, May 26th, and again on June 23rd in an effort to resolve the parties' disputes.[14] While many of CRC's responses were discussed during these sessions, with respect to Request for Production No. 1, CRC stated that it was withholding responsive data and documents based on its objections related to relevance, privacy issues, and burden.[15] CRC asserted that it would not provide data for all CRC Users, but during the June 23rd meet and confer, CRC proposed running queries for responsive data if the Bureau provided a list of specific Users.[16] The Bureau maintained its position that CRC should provide the data for all of its Users, but as an "interim step," to determine what data was actually in CRC's custody or control regarding its Users, the Bureau provided a list of 50 Users and asked

---

[14] *See* Exhibit A, ¶¶ 5-7; Letter to CRC from the Bureau pursuant to Local Rule 37-1 dated June 13, 2022 (the "Local Rule 37-1 letter"), attached as **Exhibit F**, at 1.

[15] Exhibit F at 4-7.

[16] *See generally* Exhibit A, ¶ 8; Email to CRC from the Bureau regarding CFPB Requests for Production of Documents to CRC and Daniel Rosen dated July 5, 2022, including the accompanying Excel spreadsheet, attached as **Exhibit G**; Email Chain between the Bureau and CRC regarding CFPB Requests for Production of Documents to CRC and Daniel Rosen from July 5 to July 26, 2022, attached as **Exhibit H**.

CRC to provide their data along with all of the members in CRC's "Millionaires Club."[17]

On August 22, 2022, CRC began producing documents responsive to Request for Production No. 1 for the list of Users the Bureau identified.[18] The documents included over 105,000 consumer contracts, as well as Excel spreadsheets for approximately 60 Users that contained consumers' names, addresses, and phone numbers; the name of the person who referred the consumer to the User (i.e., the lead generator); the date that the consumers had enrolled with the Users for credit-repair services; the amount of the initial and monthly fees paid by the consumer; billing dates; and memo fields that contained notes that Users had input about the consumers, including, in at least some instances, notes appearing to document sales calls. It appeared that CRC had queried some of the User data to create a report, and while the User data was far from complete, it was highly relevant as it tended to show that the Users were telemarketing and charging advance fees.

### 2.  The Bureau's effort to understand CRC's burden objection

Meanwhile, in an effort to understand CRC's assertion that producing the data would be unduly burdensome, the Bureau served interrogatories on CRC to learn about CRC's database and software.[19] CRC responded to the interrogatories on August 12 and included a data dictionary and schema for the

---

[17] Exhibit G at 1. Details on members of the Millionaires Club can be found at https://www.creditrepaircloud.com/success-stories (last accessed November 8, 2022).

[18] Exhibit A, ¶ 12.

[19] *See generally* Exhibit A, ¶ 9; Plaintiff's First Interrogatories to Defendant Daniel A. Rosen, Inc., d/b/a Credit Repair Cloud dated July 13, 2022, attached as **Exhibit I**.

CRC database.[20]

The Bureau provided the interrogatory responses and data dictionary and schema to its expert and asked him to assess whether it would be technically burdensome for CRC to produce the User data.[21] From CRC's responses and with the expert's assistance, the Bureau confirmed that it was not, in fact, burdensome for CRC to produce its database because CRC uses a common off-the-shelf database platform known as MySql.[22] The Bureau's expert provided step-by-step instructions on how to easily provide a copy of the database by using a common backup utility.

On October 21, the Bureau sent an email to CRC renewing its request for all of the User data from the CRC database, explaining that the information CRC had provided for the approximately 60 Users was highly relevant and that producing the database should not be burdensome, as it could be done in six easy steps.[23]

On October 31, CRC responded that it would not produce the database in light of the Fifth Circuit's recent opinion in *Community Financial Services Ass'n of America, Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), petition for cert. pending, No. 22-448 (filed Nov. 13, 2022). CRC also refused to provide the User data on the basis that, in its view, the information was not highly relevant since the "software does not have an autodialer feature and does not record when a CRC User has made a phone call to a prospective customer" and "[a]lthough the CRC database may contain some information regarding fees

---

[20] Exhibit J, at 11; Exhibit A, ¶ 10; Document entitled, "CRC – Databases" (CRC_002211-002255), attached as **Exhibit K**.

[21] Exhibit O, ¶¶ 6, 10.

[22] Exhibit J at 9; Exhibit O, ¶ 10.

[23] *See* Exhibit M at 2-3.

charged by some CRC Users, there is no way to identify 'advance fees.'"[24] Based on this incredibly narrow view as to what would constitute evidence of telemarketing and advance fees, CRC concluded that production of its database was "not proportional to the needs of this case."[25]

### B.   Argument

CRC's objections to producing the User data has seemingly evolved, but from the various meet and confer sessions and correspondence detailed above, it is the Bureau's understanding that CRC is withholding documents based on three objections: (1) it would be "an invasion of the affected persons' constitutional, statutory and/or common-law rights of privacy and confidentiality"; (2) it would be an undue burden; and (3) the request for all of the User data is overbroad and not proportional to the needs of the case.[26] These objections, however, are not supported in law or fact.

Rule 26 permits parties to obtain discovery on "any nonprivileged matter that is relevant to any party's claim or defense" so long as the requested

---

[24] Exhibit M at 1.

[25] *Id.*

[26] Exhibit L at 6-7; Exhibit M at 1. Following the Fifth Circuit's opinion in *Cmty. Fin. Servs. Ass'n of Am.*, 51 F.4th 616, holding that the Bureau's statutory funding mechanism violates the Appropriations Clause, CRC claimed for the first time that this alleged constitutional defect excused CRC from producing the User data. *See* Exhibit M at 1. But Defendants have not raised this as a defense in this action and CRC failed to raise this as an objection to the Bureau's discovery request. Accordingly, CRC's objection is waived. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992). Moreover, CRC has raised this issue in a motion to stay this case, and has stated that it will raise it in support of a motion for protective order, so there is no reason for the Court to separately consider CRC's newfound Appropriations Clause argument in relation to the Bureau's motion to compel. The parties will have an opportunity to brief whatever Appropriations Clause arguments CRC advances in support of its stay and protective order motions.

1  discovery is also "proportional to the needs of the case."[27] The party

2  propounding discovery has the initial burden to show relevance, but it is the

3  party resisting discovery that has the heavy burden of showing that discovery

4  into relevant matters should not be allowed.[28] As discussed in more detail

5  below, the User data stored in CRC's database is highly relevant because it is

6  crucial to determining the scope of the violations and amount of consumer

7  harm—key factual issues that go to the Bureau's claims and remedies—and

8  because CRC does not have a legitimate objection to, or any real burden in,

9  producing the database, CRC cannot carry its heavy burden to deny discovery

10  into it.

## 1. Relevance to claims

12  As an initial matter, the standard for relevance under Rule 26 is quite

13  broad.[29] But even if the standard were more stringent, the User data stored in

14  the CRC database would meet it because that information is central to the

15  Bureau's claims in this action. The Bureau claims that Defendants provided

16  substantial assistance to Users that violated the TSR's advance-fee provision,

17  which means that the Bureau must present evidence that the Users were

18  telemarketing and charging advance fees, and that Defendants knew or

19  consciously avoided knowing about the Users' violations.[30] To show that Users

20  were "telemarketing," the Bureau must present evidence that they had "a plan,

---

[27] Fed. R. Civ. P. 26(b)(1).

[28] *O. L. v. City of El Monte*, 2020 WL 7264549, at *2 (C.D. Cal. Oct. 30, 2020); *RG Abrams Ins. v. L. Offs. of C.R. Abrams*, 2022 WL 422824, at *7 (C.D. Cal. Jan. 19, 2022).

[29] *See City of El Monte*, 2020 WL 7264549, at *2 (citations omitted); *Carruthers v. Liberty Mut. Ins. Co., Inc.*, 2019 WL 4137604, at *1, *2 (C.D. Cal. May 7, 2019).

[30] *See Daniel A. Rosen, Inc.*, 2022 WL 1514439, at *4 (discussing the elements necessary to succeed in this action).

13

program, or campaign . . . to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call."[31] To show that the Users were charging advance fees, the Bureau must present evidence that they requested or received fees from consumers before (1) the time frame in which they represented their credit-repair services would be provided had expired and (2) more than six months after the promised results were achieved, as demonstrated by a consumer report provided to the consumer.[32]

The User data stored in the CRC database will allow the Bureau to establish which Users were telemarketing and charging advance fees. For example, the User data contains at least the following information that tends to show that a particular User was telemarketing: (1) User and consumer addresses that identify if any consumers were not in the same state as the User, which is evidence of interstate telephone calls; (2) memo fields where the User added notes regarding their consumers, including, in at least some cases, call notes; (3) information about User's affiliates (i.e., lead generators who direct prospective consumers to the Users), which is evidence of a plan, program, or campaign to induce the purchase of the Users' services; and (4) the User's website, which often itself contains evidence of telemarketing. The User data also shows when consumers enrolled in the User's credit-repair services and the dates when those consumers were billed for those services, which tends to show that the User charged advance fees.[33] And this is just the evidence that Bureau was able to

_____

[31] 16 C.F.R. § 310.2(gg).

[32] *See* 16 C.F.R. § 310.4(a)(2).

[33] During a meet and confer, Defendants argued that not all Users use the CRC database the same way, and that Defendants cannot verify that any User billing data is complete or accurate, *see* Exhibit F at 7 n.15, but that does not mean the data is not discoverable.

14

develop from the limited data that CRC has provided thus far in its limited response to Request for Production No. 1. In other words, there is likely more highly relevant data contained in the User data.

Critically, CRC's database contains this information for *all* Users, which will allow the Bureau to develop the scope of CRC's violations. Showing the number of Users that were violating the TSR is also evidence to support that Defendants knew or consciously avoided knowing about the Users' violations, i.e., the more Users that are violating the TSR, the more likely it is that Defendants knew or consciously avoided knowing about those violations.[34] Realistically, the Bureau cannot subpoena every User for this data, nor can it take the deposition of every User. Thus, in order to put on evidence to capture the scope of CRC's violations, the Bureau must rely on the data. The Bureau intends to use an expert to analyze the data, assist the Bureau in identifying characteristics in the data that tends to show whether Users were telemarketing and charging advance fees, and then applying those characteristics across the User population to establish which Users were more likely than not violating the TSR.

### 2.  Relevance to remedies

In addition to establishing the Bureau's claims, the User data is also critical to support the Bureau's remedies for the violations. The CFPA authorizes courts to "grant any appropriate legal or equitable relief" for violations of federal consumer financial laws, including the TSR.[35] Such relief includes legal and equitable restitution, refund of moneys, damages,

---

[34] *See, e.g.*, *FTC v. HES Merch. Servs. Co., Inc.*, 2016 WL 10880223, at *5 (M.D. Fla. Oct. 26, 2016) (finding evidence of "conscience avoidance" of TSR violations where defendant ignored a number of "red flags" that should have prompted defendant to investigate).

[35] 12 U.S.C. § 5565(a)(1).

disgorgement, civil money penalties, and limits on the activities or functions of a person.[36] Here, the Bureau's demand for relief includes a request for injunctive relief, restitution, refund of moneys and/or the payment of damages, and a civil penalty. The scope of the violations and the total amount of consumer harm bears on each of these forms of relief.

To determine the appropriate scope of injunctive relief, the Court will need to consider "the reasonable relationship between the remedy selected and the unlawful practices found to exist."[37] In other words, without a way to understand or at least approximate the full scope the unlawful practices, the Court may not have all of the information it needs to fashion appropriate injunctive relief.

The scope of the violations is also necessary to determine the total amount of consumer redress. Providing substantial assistance to anyone violating the TSR is itself a violation of the TSR and violation of the CFPA.[38] Accordingly, if a defendant provides substantial assistance, they can be held jointly and severally liable for payment of redress to consumers.[39] The proper

---

[36] 12 U.S.C. § 5565(a)(2).

[37] *FTC v. Jones*, 2017 WL 11198503, at *5 (C.D. Cal. May 25, 2017); *see also FTC v. Good Ebusiness, LLC*, 2016 WL 3704489, at *7 (C.D. Cal. July 12, 2016) (internal quotation marks and citations omitted) ("To determine the appropriate scope of an injunction, courts analyze . . . [among other things,] the seriousness and deliberateness of the violation . . . .").

[38] 16 C.F.R. § 310.3(b); 12 U.S.C. § 5565(a).

[39] 12 U.S.C. § 5565(a); *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017) (holding "that a violation of the TSR's substantial assistance rule can support joint and several liability" as a remedy for violating the FTC Act); *FTC v. Lake*, 181 F. Supp. 3d 692, 702 (C.D. Cal. 2016) (applying joint and several liability to substantial assistor of TSR and similar regulatory violations). In a meet and confer with the Bureau, Defendants have argued that, because the Bureau did not name Users as defendants in this action, the Bureau cannot obtain redress from Defendants based on their joint and several liability

measure of redress is the full amount of consumer losses, i.e., the total amount of illegal advance fees consumers paid to Users.[40]

The scope of violations and the amount of consumer harm also bear directly on civil penalties. Penalties under the CFPA are determined in two steps.[41] Under the first step, courts consider the maximum amount of the civil penalty based on the applicable tier—first tier for strict liability, second tier for a reckless violation, and third tier for a knowing violation—and the number of "day[s] during which [the] violation continue[d]."[42] For the second step, courts must consider certain statutory factors to "take into account the appropriateness of the penalty," which amongst others include, "the gravity of the violation[s]"

---

with Users. Defendants are mistaken. It has long been the rule that joint wrongdoers do not need to be named as defendants in a single lawsuit for any one of them to be liable where their liability is joint and several. *See, e.g.*, *U.S. Aviation Underwriters Inc. v. S. California Edison Co.*, 2010 WL 11553085, at *3 (C.D. Cal. Dec. 22, 2010) (quoting *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990)) ("'[I]t is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit[.]'").

[40] *See, e.g.*, *FTC v. Publishers Bus. Servs., Inc.*, 540 F. App'x 555, 556–57 (9th Cir. 2013) (the proper measure of restitution is the "full amount lost by consumers"); *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 871–72 (9th Cir. 2017) (internal quotation marks and citations omitted) (proper measure for compensatory damages "is that which will make good or replace the loss caused by the injury" as their purpose is "to return the plaintiff to the position he or she would have occupied had the harm not occurred.").

[41] 12 U.S.C. § 5565(c).

[42] 12 U.S.C. § 5565(c)(2). The maximum penalty for each tier for penalties assessed as of January 15, 2022, for violations that occurred on or after November 15, 2015, is $6,323 per violation per day (Tier 1); $31,616 per each reckless violation per day (Tier 2); and $1,264,622 per each knowing violation per day (Tier 3). *See* 12 C.F.R. § 1083.1. For violations prior to November 15, 2015, the Bureau may seek a maximum penalty of $5,000 per violation per day for Tier 1, $25,000 per violation per day for Tier 2 and $1,000,000 per violation per day for Tier 3. 12 U.S.C. § 5565(c)(2).

and "the severity of the risks to or losses of the consumer."[43] Thus, to determine the penalty in this case, the Court needs to know the scope of violations because that may inform the applicable tier—i.e., the more Users who were violating the TSR, the stronger the inference of scienter—and would certainly inform the number of days that the violations continued and "gravity" of those violations. The Court would also need to know the total amount of consumer harm to determine the "severity of the . . . losses of the consumer."

### 3. CRC's objections

Having established that the User data stored in the CRC database is relevant, it falls to CRC, the party who is resisting discovery, to carry the "heavy burden of showing why discovery [should be] denied."[44] None of CRC's three objections—related to privacy, undue burden, and proportionality—justify withholding this highly relevant information.

With respect to CRC's privacy objection, CRC did not identify in its written responses any specific privacy right at issue. Instead, during a meet and confer, CRC pointed to the California Constitution as a legal source for its privacy objection. However, as the Bureau explained in its Local Rule 37-1 letter, state law privacy interests do not bar discovery in federal question cases.[45] And even if the California privacy rights did apply in this case, it would not protect the privacy of CRC or its Users.[46] In addition, the parties stipulated

---

[43] 12 U.S.C. § 5565(c)(3).

[44] *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).

[45] Exhibit F at 5-6 n. 12; *RG Abrams Ins.*, 2022 WL 422824, at *11 (citing *United States v. Zolin*, 491 U.S. 554, 562 (1989); *Hardie v. Nat'l Collegiate Athletic Ass'n*, 2013 WL 6121885, at *3 (S.D. Cal. Nov. 20, 2013).

[46] *See DeSilva v. Allergan USA, Inc.*, 2020 WL 5947827, at *4 (C.D. Cal. Sept. 1, 2020) ("California's constitutional right to privacy does not extend to corporations."). Indeed, Congress has expressly tasked the Bureau with regulating businesses like the Users, i.e., businesses that provide credit-repair

to, and the Court entered, a confidentiality order in this case that prohibits the public disclosure of information that is deemed confidential, which is sufficient to protect any privacy and confidentiality interests.[47] Moreover, to the extent Defendants are concerned about protecting consumer report information,[48] the Bureau has narrowed its request to exclude such information.

With respect to CRC's objection that it would be overly burdensome to produce the CRC database, that assertion is simply not true. The Bureau has attached a declaration from its expert that describes how easy it would be for CRC to back up its database and produce it to the Bureau. CRC could backup the database in 6 steps, which should take about 10-20 minutes of CRC's time (not including the processing time). Indeed, it is very likely that CRC regularly backs up the CRC database as part of its normal business operations, so it can hardly say that doing so for purposes of this litigation would present an undue burden.[49]

With respect to CRC's objection that the request for all of the User data is overbroad and not proportional to the needs of the case, CRC has cited only one case, *Brunston v. Bayer Healthcare Pharms., Inc.*, 2014 WL 12587032

services. *See Daniel A. Rosen, Inc.*, 2022 WL 1514439, at *3 (finding that Users are "covered persons" under the CFPA). Thus, as one of their regulators, it would be odd if the Bureau were not permitted to obtain data about Users.

[47] *See generally* Exhibit A, ¶ 14; Stipulation and Protective Order, ECF No. 54, attached as **Exhibit N**; *City of El Monte*, 2020 WL 7264549, at *5 (allowing discovery of information that implicated privacy rights of third parties in part because protective order provided "significant safeguards from unauthorized disclosure"); *Bond v. Arrowhead Reg'l Med. Ctr.*, 2013 WL 12330716, at *3 (C.D. Cal. Aug. 12, 2013) ("[A] protective order would strike the appropriate balance between the need for the information and the privacy interests of third parties.").

[48] *See* Exhibit L at 7.

[49] *See* Exhibit O, ¶¶ 10, 13.

(C.D. Cal. May 16, 2014), for the broad proposition that producing the entire CRC database is presumptively overbroad,[50] but even in *Brunston*, the court recognized that "similar productions [of entire databases] in mass tort litigation and multidistrict litigation" had been ordered by courts.[51] Still, *Brunston* is not instructive because the opinion does not provide details about the databases that the plaintiffs had requested, like what data was stored in them or how the databases were relevant to the underlying claims.[52] Here, however, the information contained in CRC's database is highly relevant to show which individual Users are engaged in telemarketing and charging advance fees (as well as showing the total amount of consumer harm). In addition, the CRC software is a core aspect of the substantial assistance CRC provides its Users. The database itself is therefore highly relevant—indeed central—to the Bureau's allegations against CRC, and it is necessary and appropriate under these circumstances to produce the information contained therein.[53]

Finally, Rule 26 identifies specific factors courts should consider in analyzing proportionality, including "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery

---

[50] *See* Exhibit L at 6-7.

[51] 2014 WL 12587032, at *5.

[52] *Id.*

[53] *See*, *e.g.*, *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 2013 WL 682848, at *2 (N.D. Ind. Feb. 25, 2013) (ordering production of complete database where it was "highly relevant to the claims in this case"); *Goshawk Dedicated Ltd. v. Am. Viatical Servs., LLC*, 2007 WL 3492762, at *1 (N.D. Ga. Nov. 5, 2007) (ordering production of complete database over objection that database was a "non-discoverable trade secret" where contents of database were "at the center of this litigation").

outweighs its likely benefit."[54] These factors overwhelmingly weigh in favor of requiring CRC to produce the User data.

The "importance of the issues at stake" in this action are high and the "amount in controversy" is substantial. The Bureau is seeking to stop CRC from substantially assisting potentially thousands of credit repair businesses from violating the law and charging consumers illegal advance fees. For its past violations, CRC faces tens of millions of dollars in consumer redress and penalties. And to prevent CRC from committing future violations, the Bureau is seeking to permanently ban CRC from the credit-repair space.

As for the "parties' relative access," CRC is exclusively in control of the information and the Bureau has no way to access all of the User data unless CRC produces the database. The Bureau cannot subpoena every individual User for the data, and even if it could subpoena every User, it is much easier and more efficient for CRC to simply copy its database from the backend, than it would be for an individual User to produce the data using the CRC software.[55]

While the "parties' resources" is a nonfactor here since CRC does not face any real burden in producing the database, the "importance" of the User data contained in the CRC database to the Bureau's claims cannot be overstated. Here, the Bureau has alleged that CRC is providing substantial assistance to many CRC Users violating the TSR and there are thousands of Users that span the country. The only feasible way to identify the number of CRC Users that are violating the TSR is the User data from the CRC database. Without the User data, it is unlikely that the Bureau would be able to discover

---

[54] Fed. R. Civ. P. 26(b)(1).

[55] In addition to being inefficient for the Users to produce the data, receiving thousands of productions would present a severe challenge for the Bureau to be able to analyze the data in a systemic fashion. With a copy of the CRC database, the Bureau's expert can more easily analyze the data. *See* Exhibit O, ¶¶ 14-15.

the scope of CRC's violations and amount of consumer harm. Given the lack of burden on CRC to produce the database and the critical nature of the User data to the Bureau's claims and remedies, there is no legitimate argument that "the burden or expense of the proposed discovery outweighs its likely benefit."

## C.   Requested relief

For the foregoing reasons, the Bureau respectfully requests that the Court grant its motion to compel and order CRC to produce, within 10 days of the date of the order, all data stored in the Credit Repair Cloud database concerning Users, except for: (1) any data fields that contain actual email or chat messages between CRC Users and Consumers; or (2) any data fields that contain actual consumer report information.

## IV.   CRC'S STATEMENT OF DISPUTE

### A.   Factual Background

CRC objected to the Bureau's Request for Production No. 1 ("Request No. 1") on various grounds, including most notably: (1) the request is overly broad and unduly burdensome because it requires Defendant to search for and compile unlimited amounts of documents and data for thousands of Users; (2) the request imposes an undue burden on Defendant's employees – who would need to spend weeks (if not months) compiling responsive data and documents to this request – which outweighs its likely benefit; and (3) the request seeks information such as social security numbers, credit reports, and other similar information, the disclosure of which would constitute an unwarranted invasion of the affected persons' constitutional, statutory and/or common-law rights of privacy and confidentiality.[56] Throughout the parties' meet and confer process CRC explained that the Bureau is not entitled to data regarding *all* Credit Repair

---

[56] Defendant Daniel A. Rosen, Inc.'s Amended Responses to Plaintiff's First Request for Production of Documents dated August 19, 2022, attached as **Exhibit L**, at 6-7.

Cloud's Users because such a request is the equivalent of requiring CRC to produce the entire CRC database, which is overbroad and unduly burdensome. *See e.g. Brunston v. Bayer Healthcare Pharms., Inc.*, No. EDCV131904FMODTBX, 2014 WL 12587032, at *5 (C.D. Cal. May 16, 2014) (finding a request to produce an entire database is overbroad and unduly burdensome).[57] CRC also reminded the Bureau that the right to discovery is not unlimited and should not be used for the purpose of conducting a fishing expedition. CRC repeatedly asked the Bureau to identify CRC Users whom the Bureau knew or had a reasonable suspicion were committing TSR violations. Each time, the Bureau dodged the question. In a good faith effort to respond to appropriately tailored discovery from the Bureau, CRC agreed to run queries for data responsive to Request No. 1. if the Bureau provided a list of specific Users.

## 1. Compiling Data Responsive to Request No. 1 Related to 99 CRC Users Was Burdensome on CRC Employees

The Bureau requested that CRC provide the following data for 99 CRC Users:

a. The identity and contact information of Users (e.g., User profiles and contact information files);

b. The identity and contact information of Consumers who paid any User for Credit-Repair Services;

c. Payment history for Consumers who paid any User for Credit-Repair Services;

d. Each unique version of any written agreements between any Users and Consumers that signed up for the User's Credit-Repair Services;

---

[57] *Id.*; July 19, 2022 Email from Crystal Lopez to Amanda Krause, attached as Exhibit H at 3-4.

e.  Communications between Users and Consumers contained or reflected in the Credit Repair Cloud Software, including but not limited to electronic mail or messages, and call notes;

f.  Complaints from Consumers;

g.  Fees charged to Consumers, including reflecting the method of payment (ACH or credit card), amount of the fees, and payment schedule.

Keenan Jones, Vice President of Product Design at CRC oversaw a team that was tasked with gathering the requested data for the 99 CRC Users identified by the Bureau. *See* Jones Decl. at ¶ 2. CRC spent a total of 141 development hours to complete the required data export (*Id*. at ¶ 3) for approximately 60 of the 99 CRC Users the Bureau identified.[58] The labor cost associated with the time spent to complete the requested data export was approximately $4,858. *See id*. at ¶ 4. CRC produced 514,633 pages directly related to Plaintiff's broad requests for information pertaining to 99 CRC Users. *See id*. at ¶ 5.

CRC currently has approximately 16,500 CRC User accounts (these include credit repair companies subscribed to the software and their team members). *See id*. at ¶ 6. Applying the number of hours it took CRC to complete the requested data export for 99 CRC Users to 16,500 CRC User accounts means that it will take CRC personnel approximately 23,500 hours (587 40-hour weeks) to gather the data requested for all CRC Users in the database. *See id*. at ¶ 7. It may be that CRC personnel could complete this task faster given their prior experience gathering similar data in response to the CFPB's request. *See id*. However, even cutting this estimate in half yields

---

[58] CRC conducted a diligent search for responsive data for all 99 Users, but only found data for approximately 60 Users. In its regular course of business CRC does not keep a backup of data for Users after they terminate their subscription to CRC's software.

11,750 hours (approximately 294 40-hour weeks). *See id*. CRC is a small
company. Requiring CRC personnel to gather the data requested for all current
CRC Users will greatly disrupt CRC's ability to continue operating the software
and serving CRC Users. *See id*. at ¶ 8.  In addition, the labor cost associated
with the time spent to complete a data export for all CRC Users is
approximately $404,798 to $809,596 based on the hours estimates above. *See
id*. at ¶ 9.

### 2.  The Bureau  Has Already Received Over Half a Million Pages Related to CRC Users

On August 22, 2022, CRC began producing documents responsive to
Request No. 1 for the list of Users the Bureau identified. To date, CRC has
produced over half a million pages of documents directly related to the
Bureau's broad requests pertaining to CRC Users. *See* Lopez Decl. at ¶ 4. In
addition, the Bureau has received thousands of pages in response to third party
document subpoenas it has served on over thirty (30) CRC Users. *See id*. at ¶ 5.
It has also had the opportunity to depose at least three past and present CRC
Users. *See id.* at ¶ 6.

### 3.  Data Responsive to Request No. 1 Does Not Include Evidence of Telemarketing or Advance Fees Paid to CRC Users

The documents CRC produced in response to Request No. 1 include over
105,000 consumer contracts, as well as Excel spreadsheets for approximately
60 Users.  The information available on the Excel sheets varies, but generally
includes CRC Users' customers' name, address, and phone numbers; the name
of the person who referred the consumer to the User;[59] the date that the
consumers enrolled with the Users for credit-repair services; and a memo

---

[59] The Bureau erroneously assumes that this person is a "lead generator," when
in fact most CRC Users have confirmed that the vast majority of their
customers are referred by friends, family and other customers.

column that contains notes that Users had input about the customer's needs. The vast majority of the notes in the memo column of the spreadsheets discuss notes on the consumers' goals and or follow up items; they do not identify whether a sales call took place between a CRC User and a prospective customer.  When the memo field mentions "calls," in most, if not all instances, it is clearly referring to follow up calls, not sales calls.  The following examples of notes in the memo field that include the word "call" are instructive:

- "[customer] called in about his wife's account, said they wanted to try and get the SchoolsFirst FCU item off."[60]
- "1/8- tt her about pending cancellation doesn't want to cancel jason only hers. told her i would see if we can discount it. need to call her back."[61]
- "THIS CLIENTS ARE NOT ON AUTO BILL FOR RECURRING NEED TO CALL FOR EVERY PAYMENT BILLING DAY"[62]
- "CLIENT REQUESTS CALLS FROM CONNOR OR MITCH REV CCT"[63]
- "Works graves requested calls after 3PM"[64]
- "DO NOT DISPUTE CALLING WEDNESDAY TO UD CC"[65]
- "JUSTIN IS ONLY ONE WHO CAN CALL"[66]
- "OUT OF COUNTRY DO NOT CALL UNTIL HE CALLS"[67]
- "CALL LATER IN DAY WORKS MORNINGS"[68]

---

[60] *See* Lopez Decl. Ex. A, CRC User Excel Spreadsheet bates-labeled CRC_516333, at row 91, column L.

[61] *Id*. at row 97, column L.

[62] *Id*. at row 887 & 888, column L.

[63] *Id*. at row 1278, column L.

[64] *Id*. at row 1433, column L.

[65] *Id*. at row 1479, column L.

[66] *Id*. at row 1732 & 1733, column L.

[67] *Id*. at row 1771, column L.

[68] *Id*. at row 1974, column L.

These notes reflect reminders to the CRC User regarding particular requests from existing customers. Contrary to the Bureau's suggestion, the notes do not contain data documenting sales calls. Accordingly, the Excel spreadsheets do not contain evidence of telemarketing.

There is no evidence of telemarketing in any other part of CRC's database. Notably, CRC's software does not have an autodialer function.[69] The data available in CRC's database does not include call logs, call recordings, or any other records showing outbound or inbound calls on a particular date or from a particular geographical location.

Further, contrary to the Bureau's assertion, the Excel spreadsheets do not contain "the amount of the initial and monthly fees paid by the consumer."[70] Some (but certainly not the majority) of the Excel spreadsheets include Chargebee[71] data regarding initial and monthly fees that CRC Users *charged* their customers. However, the data does not confirm that customers *actually paid* those fees. Notably, as of December 2020, new CRC Users cannot integrate their Chargebee data into their CRC account.[72] *Id.*

---

[69] Lopez Decl., Ex. B, CRC's Responses to Plaintiff's First Set of Interrogatories, at 6.

[70] *See supra* Section III(A)(1).

[71] The Chargebee data includes "plan type," "plan fee," "plan set up fee," and "subscription status." Chargebee is an independent vendor that offers credit repair businesses a subscription management software that assists business to set up recurring billing and invoicing. *See* https://support.chargebee.com/support/discussions/topics/327592. Chargebee is not a payment gateway (i.e. it does not process payments). *Id.* Therefore the Chargebee data does not confirm that monthly fees were actually paid by consumers to Users. CRC's software allowed Users to integrate their Chargebee data into their CRC accounts from October 1, 2014 to December 2020. Lopez Decl., Ex. B, CRC's Responses to Plaintiff's First Set of Interrogatories, at 6.

[72] Lopez Decl., Ex. B, CRC's Responses to Plaintiff's First Set of Interrogatories, at 6.

There is no evidence of advance fees actually paid by customers to CRC Users in any other part of CRC's database or software. CRC's software does not include a payment processor function. Accordingly, there is no evidence in the database confirming that a particular customer made a payment to a CRC User on a particular date.

In sum, the Bureau incorrectly assumes that CRC's database contains evidence of TSR violations – it does not. Although CRC's database contains information regarding the geographic location of Users' customers, it does not contain evidence that Users telemarketed to or received advance fees from any customer.

### 4. The Bureau's Modified Request

On October 21, 2022, the Bureau made the following request:

[A]ll data stored on the Credit Repair Cloud Software concerning Users, except for the following:

- Any data fields that contain actual email or chat messages between CRC Users and Consumers. We have identified two tables from the data dictionary your client provided of the CRC database that potentially contains such communications: 4.25 crd_client notes table and 4.47 crd_messages table. Accordingly, please exclude these two tables as well as any other data fields that contain such information.

- Any data fields that contain actual consumer report information.[73]

CRC acknowledges the Bureau has modified its request so that it does not seek information such as social security numbers, credit reports, and other similar information, the disclosure of which would constitute an unwarranted invasion of the affected persons' constitutional, statutory and/or common-law rights of

---

[73] *See* Email Chain between the Bureau and CRC regarding CFPB v. Credit Repair Cloud – RFP 1 dated October 21 – October 31, 2022, attached as **Exhibit M**, at 2.

privacy and confidentiality.  However, the Bureau's request remains overbroad, unduly burdensome, and not proportional to the needs of the case.

**B.      Argument**

The scope of civil discovery is not unlimited.  *Hickman v. Taylor*, 329 U.S. 495, 507-08 (1947) ("[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries."). A party may obtain discovery only insofar as it relates to "any nonprivileged matter that is *relevant* to any party's claim or defense *and proportional* to the needs of the case."  Fed. R. Civ. P. 26(b)(1) (emphasis added).

**1.  The Bureau Overstates the Relevancy of the Data Requested**

**i.   CRC's Database Does Not Contain Evidence Relevant to Claims**

Contrary to the Bureau's assertion, the database does not contain evidence to show telemarketing by CRC Users. The Bureau concedes that "[t]o show that Users were "telemarketing," the Bureau must present evidence that they had "a plan, program, or campaign . . . to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call."[74]  As discussed *supra* Section IV(A)(3): (1) the Excel spreadsheets pertaining to CRC Users do not contain data documenting sales calls; and (2) the database does not contain any call logs or other evidence that CRC Users have used telephones to induce the purchase of goods or services. Further, neither the Excel spreadsheets nor any other part of CRC's database contain "the amount of the initial and monthly fees paid by the consumer."[75]

The Bureau also argues that it needs CRC's database to show advance fees charged by CRC Users. However, the vast majority of CRC Users do not

---

[74] *See supra* n. 31.
[75] *See supra* Section III(A)(1).

keep data regarding fees charged, much less fees actually paid by customers to Users.[76] Moreover, any data in CRC's database regarding fees charged or collected by CRC Users is not the best evidence; the Bureau can (and has already) requested evidence of fees directly from Chargebee.

Under Fed. R. Civ. P. 26(b)(2)(C), the Court may limit the discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." In *Young v. Pleasant Valley School District*, the court, citing Fed. R. Civ. P. 26(b)(2)(C)(i), rejected the plaintiffs' request for the restoration and production of the school district's backup tapes for its e-mail system, and noted that "[t]he burden and expense of rebuilding the district's email system in order to provide the discovery requested by the plaintiffs, along with the additional and less expensive means available for plaintiffs to get this material[,] makes the plaintiffs' discovery request impractical." *Young v. Pleasant Valley Sch. Dist.*, No. 07-854, 2008 WL 2857912, at *3 (M.D. Pa. July 21, 2008). The court in *Young* concluded that the information sought from the e-mails, although relevant, was "most likely obtainable from another source that is more convenient, less burdensome or less expensive." *Id*. The court also noted that the "resources of the parties involved and the amount in controversy in this case are relatively small," noting that the dispute did not involve "a *billionaire multi-national corporation* that could produce the material in question using a *minuscule fraction* of its budget." *Id*. at *2 (emphasis added). CRC is far from a billionaire multinational corporation for which the cost of production would be only a miniscule fraction of its budget. The information the Bureau seeks is best obtained via the Bureau's subpoena to Chargebee.

Finally, citing to *FTC v. HES Merch. Servs. Co., Inc.*, the Bureau argues it needs CRC's database to develop the scope of CRC's violations because "the

---

[76] *Id*.

30

more Users that are violating the TSR, the more likely it is that Defendants knew or consciously avoided knowing about those violations."[77]  The Bureau's argument defies logic. *HES*, does not stand for the proposition that knowledge is imputed onto a company if its customers are more likely than not violating a law. In addition, *HES* is distinguishable from this case for several reasons. In *HES*, the court, on remand, looked at whether a third party credit card processor violated the substantial assistance provision of the TSR and whether the credit card processor was jointly and severally liable for restitution and in what amount. First, *HES* is a case from the U.S. District Court for the Middle District of Florida, which is not binding on this court. Second, the facts and "red flags" in *HES* to which the Bureau cites are also distinguishable. In *HES*, the credit card processor's president was found jointly and severally liable for the TSR violation because he had "final review" of merchant account applications, reviewed the merchant account for a fraudulent company, as well as that company's owners' personal financial statements, tax returns, and credit reports. *FTC v. HES Merch. Servs. Co., Inc.*, 2016 WL 10880223, at *4 (M.D. Fla. Oct. 26, 2016). The president then approved a second merchant account for the same fraudulent company, "even though he knew by then that [the first account] had chargeback problems and was 'already on MasterCard's radar' for fraud." *Id*. Unlike the president in *HES*, Defendants do not approve CRC Users' accounts. Defendants sell software and, as with most software, CRC does not have a practice of individually approving CRC Users' accounts. Each person purchases the software and is immediately able to use the software at their own discretion. CRC does not monitor CRC Users marketing or billing practices. Nor does CRC have access to any CRC Users' financial statements, tax returns, or credit reports.

---

[77] *See supra* Section III(B)(1).

### ii. CRC's Database Does Not Contain Evidence Relevant to Remedies

The Bureau's assertion that the User data is critical to show the Bureau's remedies for alleged violations is also unsupported.  First, as the Bureau must concede, courts consider various factors to determine the scope of an injunction including: "(1) the reasonable relationship between the remedy selected and the unlawful practices found to exist, and (2) the likelihood of further, additional violations." *Federal Trade Commission v. Jones*, 2017 WL 11198503, at *5 (C.D.Cal., 2017), cited by the Bureau *supra* n. 37.  Therefore, it is not "critical" for the Bureau to submit evidence to the Court regarding all of the CRC Users' alleged underlying violations in order to obtain injunctive relief.

Second, the CRC database is not necessary to determine the total amount of consumer redress because as a matter of law CRC is not liable for consumer redress. Indeed, *FTC v. WV Universal Mgmt., LLC* and *FTC v. Lake*, which the Bureau cites *supra* n. 39, demonstrate that a defendant accused of providing substantial assistance in a TSR violation can be held jointly and severally liable for payment of redress to consumers *only when* the companies committing the underlying violation were also named in the lawsuit. *See WV Universal Mgmt., LLC,* (naming the group of corporations operating a fraudulent credit card interest reduction scheme that WV Universal was claimed to have substantially assisted in violating the TSR by providing merchant accounts); *FTC v. Lake,* (naming the companies that defendant was claimed to have assisted as defendants in the suit).

In addition, contrary to the Bureau's assertion, Defendants are not liable for the total amount of allegedly illegal advance fees consumers paid to Users. Defendants did not receive any fees from consumers and thus cannot be held liable for restitution to consumers. *See JDC, Inc. v. Interstate Hotels and Resorts*, 2010 WL 11596123, at *6 (C.D. Cal. Oct. 25, 2010) quoting *Korea*

32

*Supply Company v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003) ("Restitution is not available in circumstances where the damages sought do 'not replace any money or property that defendants took directly from plaintiff.'"); *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 699 (2006) (a plaintiff can seek money or property as restitution only when the "money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced to particular funds or property in the defendant's possession")); *Hill v. Opus Corp.*, 464 B.R. 361, 394 (C.D. Cal. 2011) (restitution is not available where the money claimed by plaintiff cannot be "traced to any particular funds in [defendants'] possession"); *see also Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1268 (1992) (when restitution is ordered, "defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct").[78]

Finally, the Bureau incorrectly argues that it needs evidence of the scope of violations to establish their request for civil penalties. It does not. First, to establish scienter the Bureau must provide evidence of Defendants' state of mind, not the number of Users who are allegedly violating the TSR. Second, the

---

[78] The Bureau may try to cite <u>Consumer Fin. Prot. Bureau v. CashCall, Inc.</u>, 35 F.4th 734 (9th Cir. 2022) for the proposition that restitution is available as to Defendants in this case. However, *CashCall* is distinguishable for several reasons. First, unlike here, *CashCall* involves a Defendant that engaged in a deceptive lending practices and *directly* demanded payment from consumers. 35 F.4th at 738. Here, CRC did not directly demand or receive payment from consumers. Second, the Ninth Circuit's reasoning in *CashCall* does not apply here. In *CashCall* the Ninth Circuit reversed the district court's denial of restitution because it inappropriately relied on a conclusion that the CFPB did not show that defendant intended to defraud consumers and that consumers did not receive benefit of their bargain. Here, Defendants argue restitution is not appropriate because they have not received any fees from consumers.

Bureau does not need CRC's database to show "the gravity of the violation[s];" instead it can (and should) compare the alleged violations in this case to violations in other cases. Finally, the Bureau does not need CRC's database to show "the severity of the risks to or losses of the consumer" because as discussed above, *supra Section* IV(A)(3), evidence of consumer losses is not contained in the CRC database.

## 2. Requiring CRC to Produce an Entire Database is Overbroad and Unduly Burdensome

Courts have found that requiring a company to produce an entire database is overbroad and unduly burdensome. *See e.g. Brunston v. Bayer Healthcare Pharms., Inc.*, 2014 WL 12587032, at *5 (C.D. Cal. May 16, 2014) (finding a request to produce an entire database is overbroad and unduly burdensome); *Murlas v. Mobil Oil Corp.*, 1995 U.S. Dist. LEXIS 3489, at *12-13 (N.D. Ill. Mar. 16, 1995) (denying production of entire database on grounds of relevance and burden); *Perfect Co. v. Adaptics Ltd.*, 2018 U.S. Dist. LEXIS 199621, at *5 (finding that, to the extent plaintiff requested specific data from defendant's database that was relevant to damages, defendant should comply, but defendant was not obligated to produce its entire accounting database).

In *Brunston v. Bayer*, plaintiffs sought the production of defendants entire databases and corresponding software and manuals, but the court found that such a request was unduly burdensome and overbroad. *Brunston* at *5. The court acknowledged that, despite the fact that courts have ordered similar productions in other cases, this "does not mean that such extensive and invasive discovery is warranted in this action." *Id*. In particular, the court pointed out that, "although defendants have an obligation to produce nonprivileged electronically stored information, plaintiffs have made no showing that defendants have failed to comply with this obligation such that plaintiffs should be entitled to conduct their own searches of defendants' databases." *Id*. Here,

CRC has complied with Plaintiff's discovery requests and in good faith worked with the Bureau to narrow down the scope of Request No. 1 to ensure the Bureau could collect discovery while not overburdening CRC. Here, as in *Brunston*, the Bureau has made no showing that CRC has failed to comply with its obligation to produce nonprivileged ESI such that the Bureau should be entitled to conduct their own searches of CRC's database.

Courts have pointed out that, while disclosure of entire databases may, in some instances, be the most cost effective way to produce large volumes of data, "any short term savings from disclosure of the entire databases are likely to be offset by the costs involved in converting the mass of unorganized data provided into useable information." *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 305 (S.D.N.Y. 2012). If CRC were to turn over the entire CRC database, it could then be burdened with having to draft a report to "impart the necessary knowledge to the [Bureau's] counsel and their experts" to help them interpret the data. *Id*. Moreover, providing the Bureau with raw data could bring about a "greater likelihood of future disputes regarding whether the parties' respective experts were utilizing equivalent, appropriately validated information." *Id*.

The Bureau's reliance on *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc*. for the proposition that CRC's database is highly relevant and it is necessary and appropriate to produce the information contained therein is unavailing. First, that case is from the Northern District of Indiana, which is not binding upon the Central District of California. Second, even the court in *Advanced Tactical* warns that a database production requires a case-specific inquiry where "the Court must limit discovery if it determines that 'the burden or expense of the proposed discovery outweighs the benefit, considering the needs of the case, the amount in controversy, the parties resources, the importance of the issues at stake in the action, and the importance

1    of the discovery in resolving the issues.'" *Advanced Tactical* at \*2. Third, the

2    court in *Advanced Tactical* found that the database should be turned over

3    because it contained information that was highly relevant to the claims in the

4    case and went to recoverable damages; here, however, not only will production

5    of the CRC database require thousands of hours of labor, it is also unlikely to

6    help the Bureau in proving its claims.[79]

7           Unlike in *Advanced Tactical*, it is unlikely that Plaintiff will find

8    information relevant to recoverable damages in the CRC database. CRC's

9    software does not have an autodialer function and the database does not include

10   call logs or any other records of outbound or inbound calls.[80] CRC's software

11   also does not include a payment processor function and the database does not

12   include information confirming dollar amounts consumers paid to CRC Users.[81]

13   **3.   The Request For The Entire Database Is Not Proportional To**

14          **The Needs Of The Case**

15          Remarkably, even after receiving hundreds of thousands of pages of

16   discovery related to CRC Users, the Bureau argues that it needs CRC's entire

17   database to support its allegations in this case. The Bureau's request must be

18   limited "because discovery must be both relevant and proportional, the right to

19   discovery, even plainly relevant discovery, is not limitless." *Morales v. Allstate*

20   *Northbrook Indem. Co.,* 2021 U.S. Dist. LEXIS 251956, at \*13-\*14 (C.D. Cal.

21   Dec. 20, 2021); *see also*, Fed. R. Civ. P. 26 (imposing a proportionality

22   requirement, hence creating a "collective responsibility" for "[t]he parties and

23   the court . . . to consider the proportionality of all discovery and consider it in

24   resolving discovery disputes."); *Goes Int'l, AB v. Dodur Ltd.,* 2016 WL 427369,

25

26

27   [79] *See Supra* Section IV(A)(3)

28   [80] *Id*.
     [81] *Id*.

                                          36

at *4 (N.D. Cal. Feb. 4, 2016) (citing committee notes requiring that "parties . . . tailor their efforts to the needs of this case").

To date, the CFPB has received hundreds of thousands (if not over a million) pages of documents from Defendants and over thirty non-parties in this case. Specifically, the Bureau has received approximately 988,604 pages in response to its requests for production, 514,633 of which are directly related to its broad requests for information pertaining to 99 CRC Users. *See* Lopez Decl. at ¶¶ 3 – 4. In addition, the Bureau has received thousands of pages from third party subpoenas, and testimony from three depositions. *See id.* at ¶¶ 5 – 6.

The Bureau's request to examine thousands of additional CRC Users is not proportional to the needs of this case because they are not necessary to establish the maximum amount of damages the CFPB could recover. In its FAC, the Bureau alleges (as fact) that Defendants substantially assisted Users A-D in violating the Telemarketing Sales Rule. FAC ¶¶ 39 – 45 (describing the conduct of four CRC Users all of whom purportedly violated the TSR). Based on these incidents, the Bureau seeks to "disgorge Defendants' unjust gains, and impose civil money penalties on Defendants for their unlawful actions." FAC at ¶ 3. If the Bureau proves the affirmative allegations in the FAC relating to Defendants' substantial assistance to <u>four</u> Users, the resulting civil penalties alone far exceed Defendants net worth.[82] The potential damages based on the affirmative allegations in the FAC far exceed Defendants net worth.

---

[82] In Daniel Rosen's Responses to Plaintiff's First Set of Interrogatories, he disclosed the value of all of his personal assets and liabilities.  Mr. Rosen has also produced his personal tax returns from 2013 to the present.  CRC has also produced tax returns, and profit and loss statements, and  balance sheets for 2013 to the present.  Due to the confidential nature of these discovery responses, Defendants cannot append them to a public filing.  Defendants will, however, bring copies of these responses to the hearing (or email them to chambers in advance of the hearing) so that the Court may see the relevant account balances.

The CFPB seeks the following second tier and third tier civil penalties:

**(B) Second tier**
Notwithstanding paragraph (A), for any person that recklessly engages in a violation of a Federal consumer financial law, a civil penalty may not exceed **$25,000 for each day** during which such violation continues.

**(C) Third tier**
Notwithstanding subparagraphs (A) and (B), for any person that knowingly violates a Federal consumer financial law, a civil penalty may not exceed **$1,000,000 for each day** during which such violation continues.

12 U.S. Code § 5565 (c)(2)(A)-(C). Indeed, Plaintiff has alleged that "Rosen **has known** or **has been recklessly indifferent** to the fact that Credit Repair Cloud has been providing substantial assistance or support to CRC Users in violation of the TSR." FAC at ¶104. If the Bureau can show that each of the four CRC Users violated the TSR (as alleged in the FAC) for three to four months each, and achieve the $25,000 second tier penalty, they could effectively shutter Defendants business with a $10,000,000 penalty. If the Bureau shows 10 days of the purported violations with a third tier penalty that would have the same effect. Where, as here, the Bureau has purported violations in hand, there is no added benefit to compelling CRC to produce its entire database, and as such create an undue burden and expense for CRC. *Vota v. Hobbs*, No. CV-21-01423-PHX-DWL, 2022 U.S. Dist. LEXIS 195906, at *50 (D. Az. Oct. 27, 2022 )("Under Rule 26(b)(1), the proportionality analysis involves 'considering the importance of the issues at stake in the action, **the amount in controversy**, the parties' relative access to relevant information, **the parties' resources**, the importance of the discovery in resolving the issues, **and whether the burden or expense of the proposed discovery outweighs its likely benefit.**'") (emphasis added). Here, when considering the potential

38

penalties from the four violations and Defendants limited resources (as Plaintiff has seen in discovery), it is clear that the expense of the proposed discovery outweighs any benefit.

Given the vast amount of information the Bureau has amassed throughout the last several years of its purported unconstitutional investigation into CRC and CRC Users, the request for CRC's entire database is not proportional to the needs of this case. In addition, the entire CRC database is not necessary to establish the maximum amount of damages the CFPB could recover.  The Bureau's request for the entire database amounts to nothing more than a fishing expedition which this Court should halt. *United States Equal Opportunity Comm'n v. Dillard's Inc.*, No. 08-CV-1780-IEG (PCL), 2011 U.S. Dist. LEXIS 76206, at *25 (S.D. Cal. July 14, 2011) (finding that, when the pre-litigation efforts were limited in terms of geography, number of claimants, or nature of claims, the EEOC could not use discovery in a resulting lawsuit as a fishing expedition to find more violations); *Brewer v. BNSF Ry. Co.*, CV 14-65-GF-BMM-JTJ, 2015 U.S. Dist. LEXIS 195235, *15 (D. Mont. Nov. 20, 2015) (denying motion to compel that "resembles a fishing expedition rather than truly seeking missing relevant information."). There is no need to produce a database pertaining to thousands of CRC User accounts after considering the vast amount of information the CFPB already possesses and Defendants' limited resources.

## 4.  The Burden and Expense of the Bureau's Request Outweigh the Benefits

Under Fed. R. Civ. P.  26, courts must limit discovery if "the burden or *expense* of the proposed discovery outweighs its benefit." (emphasis added). In *Murlas v. Mobil Oil Corp.*, the court denied Plaintiffs' request that Mobil produce an entire computer database that  inventoried materials and equipment at all of Mobil's various leaking underground storage tank facilities throughout

39

the country because the majority of the information requested involved other properties that were not at issue. *Murlas*, 1995 U.S. Dist. LEXIS 3489, at *12-13. In *Murlas*, the court also found that Mobil did not have to produce documents in response to Plaintiffs' requested production of "all documents relating to Mobil's policy, programs, and plans relating to Mobil's response to [hydrocarbon] leaks" because "discovery encompassing all Mobil policy is overbroad and the expense of such production would outweigh the likely benefit of such production." *Id*. at 15-16. Mobil asserted that complying with that request would have been a "mammoth undertaking encompassing virtually every document worldwide that deals with underground storage tanks." *Id*. at 15. Hence, due to the broad nature of the request and the significant undertaking it would be to respond to the request, the court found that the expense would outweigh any likely benefits of the production.

Much like in *Murlas*, CRC expects that producing the CRC database will be a "mammoth undertaking" that will require approximately between 11,750 and 23,500 hours of work from CRC personnel. *See* Jones Decl. at ¶ 7. Accordingly, requiring CRC personnel to gather the data requested for all current CRC Users will greatly disrupt CRC's ability to continue operating and the software and serving CRC Users. *See id*. at ¶ 8. If CRC is forced to produce the entire CRC database, the labor cost associated with the time spent to complete a data export for all CRC Users is approximately $404,798 to $809,596. *See id*. at ¶ 9. In addition to time spent by CRC personnel, CRC will likely incur additional legal fees in the tens of thousands of dollars to comply with the Bureau's request for the entire database. CRC is a small company with limited personnel that cannot afford to spend this much time and resources on such a behemoth request.

In sum, the Bureau's alleged benefit of receiving the database is outweighed by the immense financial cost and burden that this would place on CRC.

### 5. The Bureau's Funding Apparatus Contravenes the Appropriations Clause and it Cannot Continue this Action

On October 19, 2022, the Fifth Circuit Court of Appeals held in that the Bureau's self-funding scheme is unconstitutional and, therefore, the Bureau is, divested of its powers until its funding apparatus is revised. *Cmty. Fin. Servs. Ass'n of Am. v. Consumer Fin. Prot. Bureau*, No. 21-50826, 2022 U.S. App. LEXIS 29060 (5th Cir. 2022).  As discussed in detail in Defendants' Motion for Protective Order, a Ninth Circuit Panel in *Consumer Financial Protection Bureau v. Nationwide Biweekly Admin., Inc.*, Nos. 18-15431, 18-15887 (9th Cir.) ("*Nationwide*") is considering the same issue and will likely hold that the Bureau's funding mechanism violates the Constitution's separation of powers and that dismissal of enforcement actions is the proper remedy for such a violation.[83]  See Motion for Protective Order at 10-14.  Defendants should not be required to endure the undue burden and expense of producing CRC's entire database where the legitimacy of the agency issuing the request is in serious question.

The Bureau contends that Defendants' Appropriations Clause objection was waived because the objection was neither raised as a defense in this action nor raised as an objection to the Bureau's discovery request. The Bureau cites to *Richmark Corp. v. Timber Falling Consultants*. However, the facts in this case are distinguishable from those in *Richmark*. In *Richmark*, Plaintiff obtained default judgment against Defendant and then requested discovery to learn more about defendant's assets, but Defendant refused to provide the information on the

---

[83] Defendants have also filed a motion to stay the case pending the *Nationwide* decision. Dkt. No. 86.

41

grounds that the production of the information would violate the People's Republic of China's secrecy laws. The appellate court in *Richmark* applied a balancing test and held that the trial court had the power to order production of information sought by Plaintiff, even if it was prohibited by foreign law. The key distinction is that the court in *Richmark* was evaluating Defendant's objection . In *Richmark*, Defendant argued that it raised the issue as soon as possible, but the court found that "in any event, the argument cannot justify [Defendant's] failure to raise the issue before the district court as an objection to TFC's discovery request or at the very least in response to the motion to compel." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992).

**C. Defendants' Conclusion**

Despite the large volume of data that the Bureau has already collected, both via discovery and in pre-litigation investigation, the Bureau's thirst for more data is insatiable and disregards the well-established limits to discovery. The Bureau can (and should) focus its entire investigation on the four CRC Users named in the FAC. The Bureau's motion to compel CRC to produce its entire database places a significant burden on CRC that outweighs any benefit the Bureau asserts it would receive.  For the foregoing reasons, CRC respectfully requests that the Court deny the Bureau's motion to compel.

1

2    Dated: December 13, 2022       CONSUMER FINANCIAL PROTECTION BUREAU

3

4                          */s/ Carl L. Moore*
Carl L. Moore (*pro hac vice*)

5                          Amanda J. Krause (*pro hac vice*)
Joyce Chen (*pro hac vice*)

6                          Jeffrey Blumberg (*pro hac vice*)
Daniel Cheriyan (*pro hac vice*)

7                          Jennifer B. Yadoo (*pro hac vice*)

8                          Leanne E. Hartmann
Consumer Financial Protection Bureau

9                          1700 G Street, NW

10                        Washington, D.C. 20552

11

12                        *Attorneys for Plaintiff Consumer Financial Protection Bureau*

13

14

15                        MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.

16

17                        */s/ E. Crystal Lopez*

18                        E. Crystal Lopez
Joshua Briones

19                        Grecia A. Rivas
Matthew J. Novian

20                        Sofia Nuño (*pro hac vice*)

21                        Mintz Levin Cohn Ferris Glovsky and Popeo P.C.

22                        2049 Century Park East, Suite 300

23                        Los Angeles, CA 90067

24                        *Attorneys for Defendant, Daniel A.*

25                        *Rosen, Inc., d/b/a Credit Repair Cloud*

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SIGNATURE CERTIFICATION

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

*/s/ Carl L. Moore*
Carl L. Moore (*pro hac vice*)