1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JS-6**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>               Plaintiff,<br><br>         v.<br><br>Daniel A. Rosen, Inc., d/b/a Credit Repair Cloud, *et al*.,<br>              Defendants. | Case No.: 2:21-cv-07492-JFW (JDEx)<br><br>**STIPULATED FINAL JUDGMENT AND ORDER** |

The Consumer Financial Protection Bureau ("Bureau") commenced this civil action on September 21, 2021 to obtain injunctive and monetary relief and civil penalties from Daniel A. Rosen Inc., d/b/a Credit Repair Cloud ("CRC"), and Daniel Rosen (collectively, "Defendants"). The First Amended Complaint alleges violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.3(b), and section 1036 of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5536(a)(1)(A), in connection with the Defendants' provision of substantial assistance or support to credit repair companies.

The Bureau alleged that Defendants violated the TSR and CFPA by providing CRC Tools and Services to CRC Users who used Telemarketing (by, for example,

1

running advertisements that feature a number to call for more information, including such advertisements on websites or social media platforms, or otherwise encouraging Consumers to call a number) and charging Advance Fees (by, for example, requesting or receiving monthly fees, sign-up fees, first-work fees, document-processing fees, or consultation fees) in connection with providing Credit Repair Services.

The Bureau and Defendants agree to entry of this Stipulated Final Judgment and Order ("Order"), without adjudication of any issue of fact or law, to settle and resolve all matters in dispute arising from the conduct alleged in the First Amended Complaint.

## FINDINGS

1.      This Court has jurisdiction over the parties and the subject matter of this action.

2.      Defendants neither admit nor deny the allegations in the First Amended Complaint, except as specified in this Order. For purposes of this Order, Defendants admit the facts necessary to establish the Court's jurisdiction over them and the subject matter of this action.

3.      Defendants waive all rights to seek judicial review or otherwise challenge or contest the validity of this Order and any claim they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action to the date of this Order. Each Party agrees to bear its own costs and expenses, including, without limitation, attorneys' fees.

4.      Entry of this Order is in the public interest.

## DEFINITIONS

5.       The following definitions apply to this Order:

   a.  "**Active Consumer**" means any Consumer identified as a client in CRC's software for whom an activity (including but not limited to importing or providing credit reports or scores, creating or sending dispute letters, making changes or associating notes to Consumer profiles, or charging

2

Consumers any fees) was logged on CRC's software in the past 12 months.

b. "**Advance Fee**" means any fee or consideration requested or received from a Person for Credit Repair Services before: (1) the time frame in which the Seller has represented all of the goods or services will be provided to that Person has expired; and (2) the Seller has provided the Person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Examples of fees that constitute Advance Fees include:

    i. Fees charged at or around the time a Customer agrees to enroll in Credit Repair Services, regardless of whether those fees are called sign-up fees, first-work fees, document-processing fees, or consultation fees;

    ii. Monthly recurring fees; and

    iii. "Pay-per-delete" fees charged at the time or shortly after an item is removed from a consumer's credit report.

c. "**Certification Program**" means the program that Defendants are required to develop, implement, and maintain under Paragraph 8 of this Order to screen whether Users are Telemarketing and charging Advance Fees.

d. "**Clearly and Prominently**" means:

    i. In textual communications (e.g., printed publications or words displayed on the screen of an electronic device), the disclosure must be of a type size and location sufficiently noticeable for an

ordinary Person to read and comprehend it, in print that contrasts with the background on which it appears;

ii. In communications disseminated orally or through audible means (e.g., radio or streaming audio), the disclosure must be delivered in a volume and cadence sufficient for an ordinary Person to hear and comprehend it;

iii. In communications disseminated through video means (e.g., television or streaming video), the disclosure must be in writing in a form consistent with subsection (i), and must appear on the screen for a duration sufficient for an ordinary Person to read and comprehend it;

iv. In communications made through interactive media such as the internet, online services, and software, the disclosure must be unavoidable and presented in a form consistent with subsection (i);

v. In communications that contain both audio and visual portions, the disclosure must be presented simultaneously in both the audio and visual portions of the communication; and

vi. In all instances, the disclosure must be presented before the Person incurs any financial obligation, in an understandable language and syntax, and with nothing contrary to, inconsistent with, or in mitigation of the disclosures used in any communication with the Person.

e. "**Consumer**" means an individual or an agent, trustee, or representative acting on behalf of an individual.

f. "**Compliance Monitoring Program**" means the program that Defendants are required to develop, implement, and maintain under

4

Paragraph 9 of this Order to monitor whether Users are Telemarketing and charging Advance Fees.

g. "**Corporate Defendant**" means Daniel A. Rosen, Inc. d/b/a Credit Repair Cloud, and its successors and assigns.

h. "**CRC Tools and Services**" means any goods or services Defendants offer or provide to Persons to support the offering or provision of Credit Repair Services to Consumers and includes, but is not limited to, the Credit Repair Cloud customer-relationship management software; written or oral training materials; sales or marketing scripts; template contracts; template dispute letters; website domains; website templates; credit monitoring services; written publications including books, blog posts, and manuals; and social media groups.

i. "**Credit Repair Service**" means any goods or services represented to remove derogatory information from, or improve, a Person's credit history, credit record, or credit rating.

j. "**Customer**" means any Person who is or may be required to pay for goods or services offered through Telemarketing.

k. "**Defendants**" means both the Individual Defendant and the Corporate Defendant, individually, collectively, or in any combination.

l. "**Effective Date**" means the date on which this Order is entered by the Court.

m. "**Enforcement Director**" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or their delegate.

n. "**Individual Defendant**" means Daniel Rosen, including any other names by which he might be known.

5

o. "**Person**" means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

p. "**Related Consumer Action**" means a private action by or on behalf of one or more Consumers or an enforcement action by another governmental agency brought against a Defendant based on substantially the same facts as described in the Complaint.

q. "**Seller**" means any person who, in connection with a Telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the Customer in exchange for consideration.

r. "**Substantially Assisting**" means providing "substantial assistance or support" within the meaning of § 310.3(b) of the TSR, and may include, but is not limited to:

   i. providing customer-relationship management tools or services, including software;

   ii. consulting in any form whatsoever;

   iii. providing administrative support services;

   iv. performing customer service functions, including but not limited to, receiving or responding to consumer complaints;

   v. formulating or providing, or arranging for the formulation or provision of, any advertising or marketing material, including but not limited to, any telephone sales script, direct mail solicitation, or the text of any Internet website, email, or other electronic communication or advertisement. For purposes of this subpart, formulating or providing any advertising or marketing material includes formulating or providing template versions of the same;

   vi. formulating or providing, or arranging for the formulation or provision of, any marketing support material or service, including

but not limited to, web or internet protocol addresses or domain name registration for any Internet websites, affiliate marketing services, or media placement services;

   vii.  providing names of, or assisting in the generation of, potential Customers;

  viii.  performing marketing, billing, or payment services of any kind; and

   ix.  acting or serving as an owner, officer, director, manager, or principal of any entity.

Nothing in this definition shall be construed to limit any Defendant's liability after the Effective Date for conduct otherwise prohibited by the CFPA or TSR, including § 310.3(b) of the TSR.

s.  "**Telemarketer**" means any Person who, in connection with telemarketing, initiates or receives telephone calls to or from a Customer or donor.

t.  "**Telemarketing**" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. Telemarketing calls include calls conducted using any type of telephone technology, such as traditional, analog, Internet, cloud-based, cellular, Voice Over Internet Protocol ("VoIP"), and other telephone systems, with or without camera or video. Examples of conduct that constitute Telemarketing include:

   i.  Initiating telephone calls to potential Customers or hiring others to call Customers to market or sell Credit Repair Services, if at least two of the telephone calls are interstate calls.

ii.  Running advertisements on websites, social media, billboards, TV, or radio to market their Credit Repair Services that feature a number to call for more information.

iii.  Emailing or mailing a letter saying they can increase Customers' credit scores. The email or letter encourages recipients to call to learn more about the service.

iv.  Hiring someone else to engage in Telemarketing the Person's Credit Repair Services.

u.  "**User**" means any Person that offers or provides or has offered or provided Credit Repair Services to Consumers and has paid to use any CRC Tools and Services. The term "User" does not include Consumers who directly enrolled in or subscribed to any CRC Tools and Services that do not include billing and payment features and which are solely for personal, not commercial, use.

## CONDUCT PROVISIONS

## I

## Prohibited Conduct

**IT IS ORDERED that:**

6.  Defendants and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained from Substantially Assisting any Person who any Defendant knows or consciously avoids knowing uses Telemarketing to market or sell Credit Repair Services and who requests or receives Advance Fees for those services. Nothing in this Order shall be read as an exception to this Paragraph.

7.  Defendants, whether acting directly or indirectly, are permanently restrained and enjoined from violating the TSR, 16 C.F.R. pt. 310, in connection with the offering

or providing of Credit Repair Services. Nothing in this Order shall be read as an exception to this Paragraph.

## II

## Affirmative Requirements

**IT IS FURTHER ORDERED that:**

8.      Within 60 days of the Effective Date, Defendants must develop, implement, and maintain a Certification Program to screen new and existing Users to determine whether those Users are Telemarketing their Credit Repair Services and charging Advance Fees. The Certification Program shall include a requirement that all Users submit to Defendants a certification, within 90 days of the Effective Date for Users who subscribed or enrolled to CRC's software before the Certification Program was implemented or within 30 days of becoming a new User after the Certification Program is implemented, and annually thereafter, that:

    a.  Identifies any other Users with whom they share common ownership, including affiliated companies, parent companies, and subsidiaries;

    b.  Certifies whether the User has engaged in or used Telemarketing to market its Credit Repair Services during the preceding 12 months;

    c.  Certifies whether the User will engage in or use Telemarketing to market its Credit Repair Services during the next 12 months;

    d.  Describes all fees the User charges for Credit Repair Services, including when Consumers are charged, any recurring fees or other consideration, and any preconditions to requesting or receiving payment; and

    e.  If the User has engaged in or used Telemarketing or will engage in or use Telemarketing:

        i.  Certifies whether the User provides each Customer with a time frame in which all goods or services will be provided, and whether

the User requests or receives payment of any fee or consideration before the expiration of that time frame; and

ii. Certifies whether the User provides each Customer with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved, and whether the User requests or receives payment of any fee or consideration before doing so.

9.    Within 120 days of the Effective Date, Defendants must develop, implement, and maintain a Compliance Monitoring Program to monitor new and existing Users to determine whether those Users are Telemarketing and charging Advance Fees. The Compliance Monitoring Program shall include:

a. A system to monitor on an annual basis, on or around the anniversary date of the User enrolling or subscribing to CRC's software, the total number of Active Consumers for whom the User is providing or has provided Credit Repair Services.

b. A requirement that Defendants perform the following audits to determine whether Users are Telemarketing:

i. If the monitoring system identifies that a User has provided Credit Repair Services to **150 or more** Active Consumers within the prior 12-month period, then Defendants must conduct an audit of the User within 30 days. For purposes of this subparagraph, Users that have any common ownership, including affiliated companies, parent companies, and subsidiaries, shall be treated as the same User.

10

   ii. Defendants must randomly select **50** Users per quarter for an audit who do not meet the criteria in Subparagraph (i) above.

  c. The audits required by Subparagraph (b) shall include, at a minimum:

   i. A review of the User's website, and any other advertising or marketing material made available to Defendants, to determine whether the User's website or other advertising or marketing material includes a telephone number for potential Customers to contact the User for more information about or to sign up for its Credit Repair Services.

   ii. A review of the User's fee structure to determine whether the User is charging a monthly fee, a first-work fee, or any other fee within the first six months of the Customer enrolling in Credit Repair Services.

  d. After conducting the audit of a User required under Subparagraph (b), Defendants must make the determination and follow the provisions required by Paragraph 11.

10. If Defendants are unable to obtain the certification(s) from a User required by Paragraph 8, Defendants must immediately revoke that User's access to CRC's software.

11. For each User, Defendants must make a determination as to whether that User is Telemarketing and charging Advance Fees, and must take the following affirmative steps:

  a. If Defendants determine that the User is charging Advance Fees for Telemarketed Credit Repair Services, then Defendants must immediately revoke that User's access to CRC's software and notify the Bureau of its determination within 5 days of the revocation of the User's access.

   b. If Defendants determine that the User is not charging Advance Fees for Telemarketed Credit Repair Services, then Defendants must document that determination with the reasons for it.

12. Defendants must provide notice of this Order to: (1) existing Users within 30 days of the Effective Date, and (2) new Users, for a period of 5 years from the Effective Date, before they are provided access to any CRC Tools and Services. The notice shall be substantially in the form attached as **Appendix A**, and must Clearly and Prominently include the following:

   a. A description of the Bureau's lawsuit against Defendants; and

   b. A notice describing the TSR's definition of Telemarketing and Advance Fees as applicable to the offering or provision of Credit Repair Services, including examples of what constitutes Telemarketing and Advance Fees as identified in the definitions of those terms in this Order.

Defendants must require Users to certify that they have received and read the notice described in this paragraph. If any User fails to complete such certification within 30 days of delivery of the notice, Defendants must immediately revoke that User's access to CRC's software.

13. Within 10 days of the Effective Date, Defendants must:

   a. Remove from all CRC Tools and Services any reference to soliciting potential Customers or contacting leads for Credit Repair Services by telephone or videoconferencing platforms; and

   b. Remove from all CRC Tools and Services any language or software feature that recommends that Users charge Consumers monthly fees for Credit Repair Services.

### III.

### Compliance Plan

**IT IS FURTHER ORDERED** that:

14.     Within 60 days of the Effective Date, Defendants must submit to the Enforcement Director for review and determination of non-objection a comprehensive compliance plan designed to ensure that Defendants' provision of CRC Tools and Services complies with all applicable laws that the Bureau enforces, including Federal consumer financial laws, and the terms of this Order (the "Compliance Plan"). The Compliance Plan must include, at a minimum:

      a.   Detailed steps for addressing each action required by this Order;

      b.   A mechanism to ensure that the Chief Executive Officer is kept apprised of the status of compliance actions; and

      c.   Specific timeframes and deadlines for implementation of the steps described above.

15.     The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Defendants to revise it. If the Enforcement Director directs Defendants to revise the Compliance Plan, Defendants must revise and resubmit the Compliance Plan to the Enforcement Director within 15 days unless the Bureau agrees in writing to extend that time.

16.     After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, Defendants must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## IV.

### Role of the Executives

**IT IS FURTHER ORDERED** that:

17.     Corporate Defendant's Chief Executive Officer has the ultimate responsibility for ensuring that Corporate Defendant complies this Consent Order.

18.     Corporate Defendant's Chief Executive Officer must review all plans and reports required by this Order, and any submissions to the Bureau prior to such submission.

19.     One year after the Effective Date, and yearly thereafter for a period of 5 years, Corporate Defendant must submit to the Enforcement Director an accurate written compliance progress report (the "Corporate Compliance Report"), the accuracy of which is sworn to under penalty of perjury by Corporate Defendant's Chief Executive Officer, and which, at a minimum:

    a.  Describes the steps that the Chief Executive Officer has taken to reasonably assess whether Corporate Defendant is complying with the Compliance Plan, and each applicable paragraph and subparagraph of the Order;

    b.  Describes in detail whether and how Corporate Defendant has complied with the Compliance Plan, and each applicable paragraph and subparagraph of the Order, including the manner of verification of such compliance and any corrective actions taken to remedy potential non-compliance with the applicable requirement, paragraph, or subparagraph; and

    c.  Attaches a copy of each Order Acknowledgment obtained under Section VIII, unless previously submitted to the Bureau.

20.     Corporate Defendant's Chief Executive Officer must:

a. Authorize whatever actions are necessary for Corporate Defendant to assess whether Corporate Defendant is complying with the Compliance Plan, and each applicable paragraph and subparagraph of the Order;

b. Authorize whatever actions, including corrective actions, are necessary for Corporate Defendant to fully comply with the Compliance Plan, and each applicable paragraph and subparagraph of the Order; and

c. Require timely reporting by management to the Chief Executive Officer on the status of compliance obligations.

## MONETARY PROVISIONS

## V

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

21.     Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law alleged in the First Amended Complaint, Corporate Defendant must pay a civil money penalty of $1,000,000 to the Bureau.

22.     Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law alleged in the First Amended Complaint, Individual Defendant must pay a civil money penalty of $2,000,000 to the Bureau.

23.     Within 10 days of the Effective Date, Corporate Defendant must pay the full amount of its civil money penalty, and Individual Defendant must pay $500,000 of his civil money penalty. Individual Defendant must pay the remaining $1,500,000 of his civil money penalty within 90 days of the Effective Date. Defendants must make these payments by wire transfers to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

24.     The civil money penalties paid under this Order will be deposited in the Civil Penalty Fund of the Bureau as required by Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

25.     Defendants must treat the civil money penalties paid under this Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Defendants may not:

        a.  Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Order; or

        b.  Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Order.

26.     Defendants agree that each civil penalty imposed by the Order represents a civil penalty owed to the United States Government, is not compensation for actual pecuniary loss, and, thus, as to Defendants, it is not subject to discharge under the Bankruptcy Code under 11 U.S.C. § 523(a)(7).

# VI

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that**:**

27.     In the event of any default on Defendants' obligations to make payment under this Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the Effective Date to the date of payment, and will immediately become due and payable.

28.     Defendants relinquish all dominion, control, and title to the funds paid under this Order to the fullest extent permitted by law and no part of the funds may be returned to Defendants.

29.     The facts alleged in the First Amended Complaint will be taken as true and be given collateral estoppel effect, without further proof, in any proceeding based on the entry of the Order, including in a proceeding to enforce its rights to any payment or monetary judgment under this Order.

30.     Defendants acknowledge that their Taxpayer Identification Numbers (Social Security Number or Employer Identification Number), which Defendants previously submitted to the Bureau, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

31.     Within 30 days of the entry of a final judgment, order, or settlement in a Related Consumer Action, Defendants must notify the Enforcement Director of the final judgment, order, or settlement in writing. That notification must indicate the amount of redress, if any, that Defendants paid or are required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Defendants may not argue that Defendants are entitled to, nor may Defendants benefit by, any offset or reduction of any monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Defendants based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Defendants must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

32.     Upon written request of a representative of the Bureau, any consumer reporting agency must furnish consumer reports to the Bureau concerning Individual Defendant under Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C.§ 168l b(a)(1), which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Order.

**COMPLIANCE PROVISIONS**

**VII**

**Reporting Requirements**

**IT IS FURTHER ORDERED** that:

33.     Defendants must notify the Bureau of any development that may affect compliance obligations arising under this Order, including but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; the filing of any bankruptcy or insolvency proceeding by or against any Defendant; or a change in any Defendant's name or address. Defendants must provide this notice at least 30 days before the development or as soon as practicable after the learning about the development, but in any case, no longer than 14 days after the development.

34.     Within 7 days of the Effective Date, each Defendant must:

    a. Designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with each Defendant;

    b. Identify all businesses for which each Defendant is the majority owner, or that such Defendant directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

    c. Describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales;

    d. Identify Individual Defendant's telephone numbers and all email, Internet, physical, and postal addresses, including all residences; and

    e. Describe in detail Individual Defendant's involvement in any business for which he performs services in any capacity or which he wholly or

partially owns, including Defendant's title, role, responsibilities, participation, authority, control, and ownership.

35.    Defendants must report any change in the information required to be submitted under Paragraph 34 at least 30 days before the change or as soon as practicable after learning about the change, whichever is sooner.

36.    One year after the Effective Date, Individual Defendant must submit to the Enforcement Director an accurate written compliance progress report sworn to under penalty of perjury (the "Individual Compliance Report"), which, at a minimum:

      a. Lists each applicable paragraph and subparagraph of the Order and describes in detail whether and how Individual Defendant has complied with each such paragraph and subparagraph of this Order; and

      b. Attaches a copy of each Order Acknowledgment obtained under Section VIII, unless previously submitted to the Bureau.

## VIII

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

37.    Within 7 days of the Effective Date, each Defendant must submit to the Enforcement Director an acknowledgment of receipt of this Order, sworn under penalty of perjury.

38.    Within 30 days of the Effective Date, Corporate Defendant, and Individual Defendant, for any business for which he is the majority owner or which he directly or indirectly controls, must deliver a copy of the First Amended Complaint and this Order to each of its executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Order.

39.    For 5 years from the Effective Date, Corporate Defendant, and Individual Defendant, for any business for which he is the majority owner or which he directly or

indirectly controls, must deliver a copy of the First Amended Complaint and this Order to any business entity resulting from any change in structure referred to in Section VII, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Order before they assume their responsibilities.

40.    Defendants must secure a signed and dated statement acknowledging receipt of a copy of this Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. §§ 7001-7006, within 30 days of delivery, from all persons receiving a copy of this Order under this Section.

41.    Ninety days from the Effective Date, Defendants must provide the Bureau with a list of all persons and their titles to whom this Order was delivered through that date under Paragraphs 38 and 39 and a copy of all signed and dated statements acknowledging receipt of this Order under Paragraph 40.

## IX

## Recordkeeping

**IT IS FURTHER ORDERED** that:

42.    Defendants must create, for at least 5 years from the Effective Date, the following business records for Corporate Defendant and for any other business related to Credit Repair Services for which Individual Defendant is a majority owner or which he directly or indirectly controls:

    a. All documents and records necessary to demonstrate full compliance with the Compliance Plan and each provision of this Order, including all submissions to the Bureau.

    b. For each User, a record of:

        i. The User's business name, address, telephone number, and email address;

        ii. The date on which any CRC Tools and Services were purchased;

     iii.  A copy of any promotional or welcome materials provided; and

     iv.  If applicable, the date the User stopped using CRC Tools and Services, or the date and reason the User had access to any CRC Tools and Services revoked.

  c.  Records showing, for each employee providing User support or training, that Person's:

     i.  Name, telephone number, email, physical, and postal address;

     ii.  Job title or position;

     iii.  Dates of service; and,

     iv.  If applicable, the reason for termination.

Defendants must retain these documents for at least 5 years after creation and make them available to the Bureau upon the Bureau's request.

43.    Defendants must maintain, for at least 5 years from the Effective Date or 5 years after creation, whichever is longer:

  a.  All documents and records created by or provided to Defendants, including User certifications obtained pursuant to Paragraph 8, and documentation of Defendants' determinations made pursuant to Paragraph 11 of this Order;

  b.  Copies or documentation of all CRC Tools and Services made available to Users; and

  c.  All Consumer complaints and refund requests (whether received directly or indirectly, such as through a third party), and any responses to those complaints or requests.

Defendant must make these materials available to the Bureau upon the Bureau's request.

44.     All documents and records must be maintained in their original electronic format. Data should be centralized and maintained in such a way that access, retrieval, auditing, and production are not hindered.

## X

## Notices

**IT IS FURTHER ORDERED** that:

45.     Unless otherwise directed in writing by the Bureau, Defendants must provide all submissions, requests, communications, or other documents relating to this Order in writing, with the subject line, "CFPB v. Daniel A. Rosen, Inc. d/b/a Credit Repair Cloud, et al., Case No. 21-07492," and send them by email to Enforcement_Compliance@cfpb.gov:

> ATTN: Enforcement Director
> Consumer Financial Protection Bureau
> Office of Enforcement

## XI

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

46.     Defendants must cooperate fully with the Bureau in this matter and in any investigation or litigation related to or associated with the conduct described in the First Amended Complaint. Defendants must provide truthful and complete information, evidence, and testimony. Individual Defendant must appear, and Corporate Defendant must cause Corporate Defendant's officers, employees, representatives, or agents to appear, for interviews, discovery, hearings, trials, and any other proceedings that the Bureau may reasonably request upon 14 days written notice, or other reasonable notice,

at such places and times as the Bureau may designate, without the service of compulsory process.

47.     Within 30 days of the Effective Date, Corporate Defendant must complete all steps necessary to register for the Bureau's Company Portal, including providing the information required at www.consumerfinance.gov/company-signup and in the Bureau's Company Portal Boarding Form (OMB No. 3170-0054). Corporate Defendant, in connection with responding to consumer complaints and inquiries on the Company Portal, must comply with the timely response requirements set forth in § 1034(b)(1)-(3) of the CFPA, 12 U.S.C. § 5534(b).

## XII

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

48.     Within 14 days of receipt of a written request from the Bureau, Defendants must submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; provide sworn testimony; or produce documents.

49.     For purposes of this Section, the Bureau may communicate directly with Defendants, unless Defendants retain counsel related to these communications.

50.     Defendants must permit Bureau representatives to interview any employee or other person affiliated with Corporate Defendant who has agreed to such an interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in the First Amended Complaint; or (c) compliance with this Order. The person interviewed may have counsel present.

51.     Nothing in this Order will limit the Bureau's lawful use of compulsory process under 12 C.F.R. § 1080.6.

## XIII

### Transfer or Assignment of Operations

52.     Should Defendants seek to transfer or assign all or part of their operations that are subject to this Order, Defendants must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Order.

## XIV

### Retention of Jurisdiction

**IT IS FURTHER ORDERED** that:

53.     The Court will retain jurisdiction of this matter for the purpose of enforcing this Order.

**IT IS SO ORDERED**.

DATED this 12th day of August, 2024.

_____
United States District Court Judge

24

# Appendix A

## Notice to Users

The notice shall state as follows:

On September 20, 2021, the Consumer Financial Protection Bureau (the "CFPB" or "Bureau") sued Daniel A. Rosen, Inc. d/b/a Credit Repair Cloud and its owner, Daniel Rosen, alleging that they violated various consumer financial protection laws and regulations. The case was filed in Federal District Court in Los Angeles, California, and is captioned *Consumer Financial Protection Bureau v. Daniel A. Rosen Inc., et al.*, 21-07492-JFW.

The Bureau and the Defendants have agreed to settle the case. A copy of the Stipulated Judgment and Order (the "Order") entered in the case is attached to this notice. As part of that settlement, Credit Repair Cloud and Daniel Rosen are required to provide you with this notice about certain legal obligations arising from the Order.

The Order expressly prohibits Credit Repair Cloud and Daniel Rosen from providing substantial assistance or support to any credit repair organization that markets or sells its services through telemarketing and violates the Telemarketing Sales Rule ("TSR") by charging certain fees.

The TSR defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg). As identified in the Order, examples of conduct that constitutes telemarketing in this context include:

1

- Initiating telephone calls to potential customers or hiring others to call customers to market or sell credit-repair services, if at least two of the telephone calls are interstate calls.
- Running advertisements on websites, social media, billboards, TV, or radio to market their credit-repair services that feature a number to call for more information.
- Emailing or mailing a letter saying they can increase customers' credit scores. The email or letter encourages recipients to call to learn more about the service.
- Hiring someone else to engage in telemarketing the credit repair organizations' services.

As identified in the Order, Credit Repair Cloud and Daniel Rosen may not assist any credit repair organization that charges advance fees and either initiates phone calls to consumers *or* receives phone calls from consumers in response to general marketing, or hires someone else to do so. There is no exemption for companies based on the type of telephone technology used; it makes no difference whether a company makes or receives calls using low-tech equipment or the newest technology. And there is no exemption for companies who speak to consumers via webcam or videoconferencing services or platforms.

Under the TSR, credit repair organizations that market or sell their services over the phone may not request or receive payment of any fee for credit repair services until (i) the time frame in which they have represented all goods or services will be provided to that person has expired; and (ii) they have provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having

been issued more than six months after the results were achieved. As identified in the Order, examples of advance fees in this context include:

- Fees charged at or around the time a customer agrees to enroll in credit repair services, regardless of whether those fees are called sign-up fees, first-work fees, document-processing fees, or consultation fees;
- Monthly recurring fees; and
- "Pay-per-delete" fees charged at the time or shortly after an item is removed from a consumer's credit report.

The Order also requires Credit Repair Cloud and Daniel Rosen to implement a compliance program to determine whether its users are engaged in telemarketing or charging advance fees, and under certain circumstances, Credit Repair Cloud and Daniel Rosen must provide that information to the CFPB.

If a credit repair organization markets and sells its services by phone and charges any fee before the waiting period required by the TSR, it may be violating the TSR. *See* 16 C.F.R. part 310. For more information about complying with the TSR, visit: https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.